Alice **BLAIR**, Appellant,

v.

**BERKSHIRE LIFE INSURANCE
COMPANY.**

No. 17992.

United States Court of Appeals,
Third Circuit.

Argued Jan. 5, 1970.

Decided July 20, 1970.

Milford J. Meyer, Meyer, Lasch, Hankin & Poul, Philadelphia, Pa. (H. Lyle Houpt, Willow Grove, Pa., on the brief) for appellant.

George J. Miller, Dechert, Price & Rhoads, Philadelphia, Pa. (Harvey Bartle, III, Philadelphia, Pa., on the brief) for appellee.

Before BIGGS, ALDISERT and STAHL,* Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

On or about February 25, 1965, Berkshire Life Insurance Company, the defendant-appellee, delivered to Walter Blair in Pennsylvania an executed insurance policy on his life and received from him the required premium. His wife Alice Blair, the plaintiff-appellant, was named as beneficiary. Walter Blair died on May 1, 1965, of an acute coronary occlusion, and Berkshire refused on demand to pay the death benefit asserting in its answer that the application for the policy contained pertinent repre-

---

* Judge Stahl heard the argument in this case but died before a decision was reached.

sentations which were untrue, thereby voiding the policy.

The policy had attached to it an application for life insurance consisting of two parts. Part I and Part II each have written on them in longhand the name "Walter Blair" above the printed heading "Signature of Proposed Insured". Part II dealt with Blair's health and medical history. At trial Berkshire produced evidence that demonstrated conclusively that certain statements in Part II were false,[1] but Mrs. Blair asserts in substance that these statements were not made by Walter Blair, that he had not signed Part II of the application or indeed that he was not even the person who had been examined by Dr. Smith, the Berkshire examining physician.

It is conceded that Blair signed Part I of the application, and there is some evidence that he also signed Part II. Berkshire agents Doheny and Pileggi testified that they told Blair that he would be required to undergo a physical examination which would be arranged for him by Berkshire. Dr. Smith, an examiner for Berkshire, testified that an individual claiming to be Walter Blair arrived at his office at the appointed hour, submitted to examination, supplied the answers in Part II, and signed Part II with the name of Walter Blair. Dr. Smith, however, had no other personal acquaintance with the insured and during the trial was unable to identify him from his passport photograph.

Mrs. Blair presented an altogether different version of the circumstances surrounding the making of the Berkshire application. She testified that the words "Walter Blair" appearing in Part

---

1. Some of the relevant questions and answers on Part II were as follows:

"3. During the past five years have you:

*    *    *    *    *

C. Had any X-rays, electrocardiagrams, blood or other diagnostic test?                                          *No*

"4. Have you ever had, or been told by a physician or other practitioner that you had, or been treated for:

A. Chest pain, angina, shortness of breath, rheumatic fever, heart murmur, high blood pressure, or any other disease of the heart or blood vessels?                                   *No*

*    *    *    *    *

G. Arthritis, bursitis, gout, rheumatism, sciatica, or any other disorder of the back, spine, muscles, bones or joints?                                        *No*

*    *    *    *    *

"13. When did you last consult a doctor? Date ——— 1955

Doctor's name:          Dr. Kirscher
Address:                Roslyn, Pa.
Reason:                 common cold
Result:                 'Well in two days'"

As we have indicated the record contains copious proof that many of the listed answers were false. It was stipulated that between 1962 and 1965 a Dr. Baer saw Blair several times and took electrocardiagrams on three occasions. Baer, a board certified internal medicine specialist and cardiologist, testified that two of the electorcardiagrams revealed abnormalities caused either by high blood pressure or heart damage. He testified further that he told Blair that he had a "heart condition" and advised him against taking a scheduled vacation trip because he might have suffered "an acute heart attack". It was also stipulated that Blair had consulted a Dr. Frieman on several occasions during the five years prior to the Berkshire application. Frieman, the general practitioner who had referred Blair to Baer, testified that he had seen Blair professionally over forty times between 1959 and 1965. At a number of these visits Blair complained of joint pain which Frieman diagnosed as gout. Frieman treated Blair for gout as late as January 29, 1965, less than one month before the execution of the Berkshire policy. Throughout this entire period and as late as 1965 Frieman treated Blair for high blood pressure. Finally, in 1962 Baer told Frieman that Blair had suffered a "mild infarction", and Frieman in turn relayed this information to Blair, informing him that he had had a "mild heart attack" and that he "definitely did have [heart] damage".

Mrs. Blair did attempt to impeach the credibility of some of this medical testimony. Blair's passport was introduced into evidence to show that he had been abroad on the dates of several of the alleged medical consultations. But the bulk of Berkshire's evidence respecting Blair's medical history is uncontradicted and *the stipulated facts alone* demonstrate some of the answers in Part II to be untrue.

II of the application were a "very poor imitation" of her husband's signature. Acknowledged samples of Walter Blair's signature were available to Berkshire but no evidence was offered respecting these signatures and no questioned-document expert was called by either side. Mrs. Blair testified further that Doheny instructed her husband that a physical examination would not be needed because the pertinent medical information would be obtained from his prior application for life insurance from the John Hancock Insurance Company. Berkshire thereafter introduced three John Hancock life insurance policies which had been issued previously to Walter Blair together with copies of his applications for these policies. The applications contained untrue answers very similar to those contained in Part II of the Berkshire application. Mrs. Blair verified the signatures on the Hancock applications as those of her husband.

At the close of all evidence the District Court directed a verdict in favor of Mrs. Blair but limited in amount to the premium paid on the policy. The trial Judge reasoned that Walter Blair either signed Part II, in which case he was responsible for the false answers contained therein, or he did not sign Part II, in which case the policy was void for want of consideration. In addition, the trial Judge concluded that if Walter Blair did not sign Part II he was in any event responsible for the false information in the Hancock applications.[2] This appeal followed.

In this court the plaintiff, Mrs. Blair, in Part "I." of her brief and argument relies on Section 318 of The Insurance Company Law of 1921, P.L. 682, 40 P.S. § 441, reenacting the Act of May 11, 1881, P.L. 20, which provides in pertinent part: "All insurance policies, issued by * * * insurance companies * * * doing business in this State, * * * in which the application of the insured * * * form[s] part of the policy or contract between the parties thereto, or * * * [has] any bearing on said contract, shall contain, or have attached to said policies, correct copies of the application as signed by the applicant * * *; and, unless so attached and accompanying the policy, no such application * * * shall be received in evidence in any controversy between the parties to, or interested in, the policy, nor shall such application * * * be considered a part of the policy or contract between such parties."

Mrs. Blair asserts that in view of the provisions quoted, Part II cannot be deemed to be part of the policy and that therefore she is entitled to recover the full amount of the death benefit, citing

---

2. Although there was no formal opinion, the views of the trial Judge respecting the liability of the parties can be gleaned from his statement to the jury in announcing the directed verdict, as follows:

"In this case, if the decedent signed the application, Part 2, which has all the misstatements, then it would be clear that the policy would be void because of misrepresentations as to a material fact, namely the question of whether he had ever had any high blood pressure, whether he had ever been treated by a doctor in the past three or five years, whatever the period was, and so forth.

"If, on the other hand, as plaintiff apparently contends, the decedent did not sign Part 2 of the application and didn't make those representations, then it seems equally clear that the policy never became effective and is equally

subject to being cancelled" Tr. at 159.
Also of note is the following exchange between Mrs. Blair's counsel and the court during the course of argument upon the motion for directed verdict.

"MR. HOUPT: I fail to see, Your Honor, how the medical portion of the John Hancock policy in any way affects this matter, in any way, shape, or form.

"THE COURT: Well, the only conceivable way it would, would be if the jury found Mr. Doheny told the insured that he had to have an examination and that they would get the medical information from the John Hancock application. If that is the case, then it would seem that the decedent would be as responsible for any misrepresentations in the John Hancock application as he would in the present application." Tr. at 152.

Syme v. Bankers National Life Insurance Company, 393 Pa. 600, 606–607, 144 A.2d 845, 849 (1958). She lays emphasis on the phrase, "as signed by the applicant" and since she takes the position that her husband's signature to Part II is a "very poor imitation", she asserts that Berkshire's defense of fraud necessarily is obliterated as a matter of law. This attack on Berkshire's defense insofar as we are able to ascertain was not raised in the District Court. Whether it can be properly asserted in this court as a matter of fundamental justice is a question which we need not presently decide in view of our disposition of the appeal.[3] Bogacki v. American Machine & Foundry Co., 417 F.2d 400, 407 (3 Cir.1969). The issues raised in the District Court by Mrs. Blair are not well delineated in the record or clearly asserted in this court, save only one, the alleged forgery of Walter Blair's signature to Part II of the Berkshire application. But the alleged forgery of Blair's signature was before the District Court on Berkshire's motion for directed verdict and the issue is before this court on appeal, and we, therefore, can proceed to determine the validity of the judgment below on this issue, if no other. We point out that Berkshire's motion for a directed verdict having been granted, we are compelled to take the view of the evidence most favorable to Mrs. Blair. ▇▇▇ We agree with the District Court that if Walter Blair signed Part

II Berkshire would be entitled to avoid liability on the policy. See, *e.g.*, Baldwin v. Prudential Insurance Company, 215 Pa.Super. 434, 258 A.2d 660 (1969). Whether or not Blair signed Part II, in view of Mrs. Blair's testimony, in and of itself presents a jury question.[4]

▇▇▇ By way of further explication we state that if Walter Blair caused an imposter to take the physical examination and to answer and sign Part II in his stead, Berkshire would also have a complete defense. Petaccio v. New York Life Insurance Company, 125 Pa.Super. 15, 189 A. 697 (1937). But it must also be borne in mind that the answers to the questions in Part II were representations, not warranties,[5] and in order to avoid liability on the ground of the insured's representations the insurer must prove three elements: (a) the materiality of the representations, (b) the falsity of the representations, and (c) the insured's knowledge of their falsity or bad faith. Evans v. Penn Mutual Life Insurance Company, 322 Pa. 547, 186 A. 133 (1936); *Baldwin, supra.* It is beyond dispute that the answers recorded in Part II were both material and false. But accepting, as we must, Mrs. Blair's testimony that her husband did not sign Part II and that he was told that a physical examination would not be needed, we can find no basis in the evidence for concluding that he knew of the false answers in Part II or that he otherwise acted in bad faith respecting Part II.[6]

---

3. As the appellant's brief itself points out, in view of the fact that Mrs. Blair failed to move for a new trial under Rule 59 or judgment n. o. v. under Rule 50, Fed.R. Civ.Proc., 28 U.S.C., our authority appears to be limited to the granting of a new trial.

4. In so stating we are aware that if there is testimony by someone, not necessarily a handwriting expert, familiar with the signature of an applicant on an application such as that before us, that the signature is a forgery, the credibility of the witness is for the jury. Such evidence can, of course, be repudiated but here no rebuttal was undertaken by Berkshire. The hornbook rule is that a witness who can read is competent to testify as to the

authenticity of a person's signature if he has seen the person write at least once or if he has seen writings purporting to be those of the person in question under circumstances vouching their genuineness. McCormick on Evidence § 189, pp. 400–401 (1954 ed.).

5. A provision in the body of the insurance contract states: "All statements made by or in behalf of the Insured shall be deemed representations and not warranties."

6. In *Evans, supra,* the Pennsylvania Supreme Court stated that "a mere showing of falsity of answers appearing in the application does not avoid the policy where the answers were not made by insured at all or with his knowledge but were supplied by some one else after the

Berkshire's alternative position and that of the District Court is that if Mrs. Blair be believed, Blair would be responsible for the representations contained in the Hancock applications. It is not disputed that some of the answers in the Hancock applications were material and untrue, and, according to Mrs. Blair, when Doheny stated that a physical would not be needed and that he would obtain the necessary medical data from the Hancock applications, her husband responded, " 'fine, fine, fine' ". This is indeed admissible evidence of Blair's fraudulent intent [7] but does not suffice to take the question from the jury since we must take that view of the evidence most favorable to Mrs. Blair. The Hancock applications had been made some time prior to the Berkshire application, and Blair did not have them in front of him when he supposedly acquiesced in Doheny's expressed intent to rely upon them. It is also possible that Blair's response of "fine, fine, fine," was merely a positive reaction to the news that he would not have to take a physical. In these circumstances the jury might well have harbored substantial doubts that Blair had a current awareness of the inaccuracies in the Hancock applications at the time of his meeting with the two Berkshire agents.[8, 9]

■■ We cannot accept Berkshire's contention that if the insured did not execute and sign Part II the policy is void for want of consideration. Contained in the body of the policy is the statement that "[t]his policy has been issued in consideration of the written application and the payment of premiums as provided," and Part I of the application immediately above Blair's admitted signature provides that "the statements of the Proposed Insured in Part 2 shall form the basis and be part of the contract of insurance, * * *." Berkshire relies upon these provisions and cites the Restatement, Contracts, Section 274(1) which provides: "In promises for an agreed exchange, any material failure of performance by one party *not justified by the conduct of the other* discharges the latter's duty to give the agreed exchange even though his promise is not in terms conditional. * * *" (Emphasis added). A policy of insurance is a contract and stands on no different basis than any other contract, Cleland Simpson Co. v. Firemen's Insurance Co., 392 Pa. 67, 140 A.2d 41 (1958), and Pennsylvania has accepted Section 274 of the Restatement, Schlein v. Gross, 186 Pa.Super. 618, 142 A.2d 329, 333 (1958). But if Blair was in fact told that a physical examination would not be needed and that Berkshire would obtain his medical history from another source, his failure to complete Part II of the Berkshire application would certainly be, in the words of Section 274, "justified by the conduct" of Berkshire.

---

signing of the application, since in that case insured could not have known of their falsity at the time of the application and hence no bad faith is shown." 322 Pa. at 554, 186 A. at 138.

7. It is the law of Pennsylvania that fraud or misrepresentation in procuring insurance may be shown by *any* competent evidence extrinsic the insurance application. Gordon v. Continental Casualty Co., 311 Pa. 109, 166 A. 557 (1933).

8. Moreover, it is difficult to perceive how Berkshire can rely at all on the Hancock applications in light of the provision in the insurance contract that "[a]ll statements made by or in behalf of the Insured shall be deemed representations and not warranties. *No such statement shall be used to void this policy, or used in defense of a claim, unless it is contained in the written application and a copy of the application is attached to the policy when issued.*" (Emphasis added). This point has not been raised by either party and, consequently, we do not base our decision on it.

9. These particular circumstances serve to distinguish Indovina v. Metropolitan Life Ins. Co., 334 Pa. 167, 5 A.2d 556 (1939), and Ostrov v. Metropolitan Life Ins. Co., 379 F.2d 829 (3 Cir. 1967).

The case at bar is not one for a directed verdict.

Other issues raised by the parties do not require discussion.

Accordingly, the judgment of the District Court will be reversed and the cause remanded with the direction to proceed as required by this opinion.