**AMERICAN MUTUAL LIFE
INSURANCE COMPANY,
Plaintiff and Appellee,**

v.

**James JORDAN and James H. Jordan
and Associates, Ltd., Defendants
and Appellants.**

**Civ. No. 10029.**

Supreme Court of North Dakota.

Jan. 25, 1982.

---

Tenneson, Serkland, Lundberg, Erickson & Marcil, Fargo, for plaintiff and appellee; argued by Ronald H. McLean, Fargo.

Dosland, Dosland & Nordhougen, Moorhead, Minn., for defendants and appellants; argued by John P. Dosland, Moorehead.

SAND, Justice.

This is an appeal by the defendant, James Jordan and James H. Jordan and Associates, Ltd. [hereinafter referred to as Jordan], from a district court judgment[1] allowing the plaintiff, American Mutual Life Insurance Co. [American Mutual] to recover from Jordan $27,101.43 in commissions, overwriting allowances, and office expense payments arising out of transactions between Jordan and third-party insureds involving insurance policies written by American Mutual. The district court judgment also dismissed Jordan's counterclaim for damages arising out of the allegedly unauthorized use and appropriation of his name by American Mutual for commercial purposes.

In February 1978 American Mutual entered into an "agent's agreement" and a "general agency contract" with Jordan which authorized Jordan to sell American Mutual's insurance policies and entitled him

---

[1] The total judgment, exclusive of costs and interest, was $22,870.22. This total represents $14,799.92 found by the district court to be due American Mutual in relation to policies regarding John and Isabelle Burkel, and $8,070.30 represents money due American Mutual in relation to policies regarding other third parties. Jordan admits indebtedness for the $8,070.30. Consequently, that portion of the judgment is not before this Court.

to compensation based on the premium received by American Mutual. American Mutual and Robert Medhus entered into identical agreements. The agent's agreement contained the following relevant provisions:[2]

"14. Delivery of Policies. The agent shall not deliver any policy except upon full payment of the premium and during the lifetime and good health of the applicant, and shall immediately upon delivery of any policy remit the full settlement thereon in cash to the Company. If any policy is not delivered and paid for within the delivery period stipulated by the Company therefor, such policy shall be immediately returned to the Company with full information as to why it was not delivered.

"15. Rejection; Fees; Return of Premiums. . . .

"The Agent shall pay to the Company upon demand all compensation received by or credited to the Agent, or premiums collected, or evidence of indebtedness representing same, taken on applications on which policies are not issued by the Company, or on policies declined by the applicant, or on policies cancelled by the Company, and all compensation received or credited on premiums or any part thereof which for any other reason the Company may return."

In March 1978 Jordan and Medhus contacted John Burkel and Isabelle Burkel [the Burkels] of Greenbush, Minnesota, regarding life insurance policies. Jordan and Medhus went to Greenbush with applications for insurance policies for both Prudential Insurance Co. [Prudential][3] and American Mutual. On 30 March 1978 applications

for nonrated life insurance policies[4] with American Mutual and Prudential were executed subject to medical examinations. Subsequent medical examinations revealed health problems which indicated that the Burkels were substandard risks. Based on the medical examinations, Prudential became disinterested in the Burkels as policy holders.

American Mutual, by a letter to Medhus dated 8 June 1978, advised that because of the health problems it could not approve the Burkels' original applications as submitted and enclosed "rated" policies to reflect the risk attendant with these health problems. On 17 July 1978 Jordan went to Greenbush alone and informed the Burkels of American Mutual's letter denying their original applications and of the policies with "rated" premiums.

The parties dispute whether or not the rated policies were delivered to or accepted by the Burkels at this time. Jordan testified that he went through the policies very thoroughly with the Burkels and advised them of a ten-day free look[5] provision. Jordan testified that he and the Burkels discussed some changes in the rated policies and that certain changes were agreed upon. Jordan further testified that he recommended that the policies be put in force and be kept in full force while the changes were made. American Mutual asserts that the Burkels were not satisfied with the rated policies and that they did not accept them at that time, nor did they ever accept a policy issued by American Mutual. American Mutual also questions if Jordan even brought the insurance policies with him to Greenbush on July 17. The district court found that the "Burkels did not accept the

---

2. The General Agency contract contained identical provisions except that the term "general agent" was used instead of the term "agent."

3. Jordan and Medhus were also agents for Prudential Insurance Company.

4. A "non-rated" policy is a policy in which premiums reflect that the applicant or insured has no health problems which would cause the insurance company to seek a higher premium than normal, whereas a "rated" policy is a

policy in which health problems require a higher than normal or "rated" premium.

5. The ten-day free look provision provided as follows:

"The insured may, within 10 days after receipt of this policy, return it to the Company for cancellation, whereupon any premium paid will be refunded in full and the policy shall be void from the effective date with the insured and the Company being in the same position as if no policy had been issued."

highly rated policies nor was there delivery."

In any event, at the 17 July meeting between Jordan and the Burkels, Jordan received a $500 check containing a notation, "pension and contributions," from the Burkels. The $500 check was not the full amount of one month's premium, and Jordan testified that his usual procedure was to obtain such a payment as a sales technique. Jordan forwarded the check and a request for policy change forms to American Mutual and also asked American Mutual to charge his agent's commission account for the balance of any premiums due from the Burkels.

Jordan testified that he had an understanding with American Mutual through its vice president, Sam Kalianov, that the company would "annualize"[6] his commissions upon receipt of the first month's premium. Kalianov denied there was such an agreement and testified that the company would "annualize" commissions if a "check-o-matic" plan[7] and a check for the first month's premium was obtained. Jordan and Medhus then asked Mr. Burkel to execute a check-o-matic which authorized American Mutual to draw checks on his bank. The record reflects that Burkel executed a check-o-matic on 2 August 1978 at Greenbush with Medhus and Jordan's attorney, William Gray, present. At the same time the Burkels were advised that they could cancel the check-o-matic. The record also suggests that the Burkels were told to execute the check-o-matic and to subsequently revoke it. On 2 August 1978 Burkel's check for the balance of the first month's premium in the amount of $2,050.00[8] was obtained and Gray took the check and the check-o-matic form to Des Moines, Iowa, to obtain Jordan's "annualized" commission. At this time the Burkels were apparently still dissatisfied with the rated policies.

Upon receipt of the first month's premium and the check-o-matic form, American Mutual paid the agents' commissions, overwriting allowances and office expense payments on an annualized basis. The Burkels subsequently revoked the check-o-matic authorization and American Mutual sent them a form in which they offered the Burkels the option of paying premiums by monthly check. When American Mutual failed to receive the monthly premium after the check-o-matic was revoked, it sent a lapsed notice dated 26 Oct. 1978 to the Burkels and offered to reinstate the policies upon receipt of a signed reinstatement request and an additional premium. However, the request was not signed by the Burkels.

Medhus then informed American Mutual of the lack of delivery and acceptance of any American Mutual insurance policy by the Burkels. American Mutual was further informed by Medhus that the Burkels should be given their premium back because the Burkels had been told their money would be repaid them if they were not satisfied. American Mutual then returned all the premiums to the Burkels.

Medhus subsequently repaid American Mutual the compensation which American Mutual had paid him on the basis of the policies to the Burkels; however, Jordan refused to repay the sums advanced as commissions, overwriting allowances, and office expense payments. American Mutual brought this action against Jordan to recover commissions, overwriting allowances and office expense payments arising out of the transactions with the Burkels. Jordan claimed that he delivered the initial policy to the Burkels on 17 July 1978 and was entitled to at least part of the payment. American Mutual claimed delivery did not occur then and, because of a later rejection of all the policies by the Burkels, the sums

6. An "annualized" payment means that the agent's commissions are paid to the agent as if the full annual premium was paid to the company.

7. The "check-o-matic" plan is an automatic check payment plan whereby the insureds pay a one-month premium and sign an agreement to allow the insurance company to draw checks on the insured's bank account for future monthly installments on the annual premium.

8. This check contained a notation, "pension and contribution."

paid to Jordan in the form of commissions, overwriting allowances and office expense payments should be refunded to them.

After a trial without a jury, the district court entered a memorandum opinion, findings of fact and conclusions of law and order for judgment ordering Jordan to repay to American Mutual the sums paid regarding the Burkels' insurance because there was no delivery of policies identical in terms as applied for by the Burkels and acceptable to the Burkels. The district court also dismissed Jordan's counterclaim for wrongful appropriation of his name. Judgment was entered and Jordan appealed to this Court.

The first issue raised by Jordan is that the trial court's finding that there was no "delivery" or "acceptance" was clearly erroneous. Specifically, Jordan's brief points to the following findings as erroneous:

"VIII.

"After July 17, 1978, Jordan made various counteroffers to American Mutual Life Insurance Company regarding the Burkels. The counteroffers evidenced there had been no delivery, acceptance or meeting of the minds between the Burkels and American Mutual Life Insurance Company."

"X.

"In August, 1978, the Burkels still were not satisfied with the rated policy and never accepted it. Nevertheless, the agents secured a monthly premium check by telling the Burkels it would be refunded if they did not ever accept any policy and secured a 'check-o-matic' from the Burkels by telling them to cancel the 'check-o-matic' at their bank after having it executed."

"XII.

"After receiving the checks, Jordan and Medhus made further contacts with the Burkels. The Burkels at all times were not satisfied with the American Mutual Life Insurance policies because the high ratings attributable to their health problems could not be lowered. The Burkels never accepted any policy and no policy was ever left with them."

"XIX.

"Defendants never made delivery and pursuant to the Agents Agreement, Defendants were required to pay back to American Mutual Life Insurance Company all commissions received which totaled $8,328.50."

The parties agreed that if delivery did not take place, American Mutual would be entitled to have the money refunded.

■■■ An insurance policy is a contract and is judged by the same legal principles as any other contract. *Blair v. Berkshire Life Insurance Co.*, 429 F.2d 996 (3rd Cir. 1970); *Latino v. Hardware Mutual Casualty Co.*, 413 F.2d 1043 (5th Cir. 1969). Therefore, the principles of contract law relating to offers, acceptances, and counteroffers are applicable to insurance policies. We are also cognizant that the law of agency and the concept of an agent's authority, either actual or ostensible, to bind the principal may be sufficient to put an insurance policy in effect. However, in this instance the critical question is not that the Burkels were able at any time to enforce an insurance policy with American Mutual. Rather, the contractual provisions between Jordan and American Mutual control whether or not American Mutual was entitled to a refund of the money.

The scope of review of the trial court's findings on an appeal to this Court from a case tried without a jury is limited by Rule 52(a), North Dakota Rules of Civil Procedure which provides, in part:

"... Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses...."

■■■ A trial court's findings of fact are "clearly erroneous" when, although there is some evidence to support them, the review-

ing court from the entire evidence is left with a definite and firm conviction that a mistake has been made. *Keidel v. Rask*, 290 N.W.2d 255 (N.D.1980). The mere fact that the appellate court might have viewed the facts differently if it had been the initial trier of the case does not entitle it to reverse the lower court. *In re Estate of Elmer*, 210 N.W.2d 815 (N.D.1973). Furthermore, "a choice between two permissible views of the weight of the evidence is not clearly erroneous." *In re Estate of Elmer, supra* at 820 citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949). Furthermore, Rule 52(a) provides that it is within the trial court's province to judge the credibility of the witnesses.

■ In connection with this credibility, Jordan asserts that the following statement in the trial court's memorandum opinion erroneously affected the trial court's view of his credibility:

"However, such is not the case where the agent has intentionally and wrongfully, as Jordan has done here, schemed to deprive his principal of monies not legally due the agent and where no delivery has taken place, there can be no lapse issue."

Jordan in his brief states that:

"... the Court appears to be making reference to the cancellation of the check-o-matic by the insured Burkel and the agent's advice that this was what the insured should do to put the insurance on a monthly payment plan."

Jordan asserts that he merely advised the Burkels of their option to cancel the check-o-matic and there was nothing improper with this conduct.

However, we believe Jordan's contention overlooks the testimony at trial that in order for Jordan to receive his "annualized" commission, American Mutual required a check-o-matic form and a check for the first month's premium. Although Jordan was entitled to inform the Burkels of their option to cancel the check-o-matic it is an entirely different proposition to tell the Burkels to execute the check-o-matic and to subsequently cancel it. These instructions,

coupled with the testimony that Jordan had a cash flow problem at that time and the testimony that in order for Jordan to receive his "annualized" commission American Mutual required a check-o-matic form and the first month's premium all lead to an inference of intentional or wrongful conduct in procuring the "annualized" commission.

In this instance each party developed a different factual theory to support its right to the "annualized" commissions and each of these theories has some factual basis in the record. Because the trial court was able to view and give appreciable weight to the testimony we cannot say that its finding that there was no delivery or acceptance is clearly erroneous. Therefore, American Mutual is entitled to have the money refunded.

■ The next issue raised by Jordan is that the trial court's finding that there was no credible evidence to support his claim for wrongful appropriation of his name is clearly erroneous. In conjunction with this, Jordan asserts that the trial court erroneously concluded that a cause of action for wrongful appropriation of one's name does not exist in North Dakota.

The allegations surrounding this issue reflect that American Mutual allegedly used Jordan's name in its attempts to recruit Thomas Latuff as an agent to sell its insurance products. Jordan asserts that his high professional standing in the insurance field and the use of his name to recruit potential agents amounts to a commercial use of his name to the effect of a "testimonial" of the American Mutual insurance product. Thus, Jordan asserts that American Mutual wrongfully appropriated his name for commercial purposes without his consent. See, Prosser, Torts (4th ed.) § 117 (1977).

In *Volk v. Auto Dine Corporation*, 177 N.W.2d 525 (N.D.1970), we observed that whether or not the tort of invasion of privacy existed in North Dakota had not been determined. See also, *City of Grand Forks v. Grand Forks Herald*, 307 N.W.2d 572 (N.D.1982). In *Volk, supra*, we assumed,

without deciding, that a cause of action existed for the violation of privacy, but we determined that such action would not lie because there was consent to the use of the plaintiff's (Volk's) name.

In this instance there is conflicting evidence as to whether or not American Mutual had permission to use Jordan's name when their representatives contacted Latuff. Jordan asserts that he categorically refused permission to use his name and that he affirmatively instructed American Mutual to that effect. American Mutual asserts that any statement that Jordan was an agent of American Mutual was completely true and of public record, and further that Jordan consented to the use of his name to recruit Latuff.

The district court found that American Mutual was told by Jordan that it could use his name when contacting Latuff. Based on the conflicting evidence and the opportunity of the trial judge to give appreciable weight to conflicting evidence, this finding is not clearly erroneous. The trial court having found as a fact that Jordan consented to the use of his name, there is no need for us to determine if a cause of action for wrongful appropriation exists in North Dakota.

Accordingly, for reasons stated in this opinion, the judgment of the district court is affirmed.

ERICKSTAD, C. J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.