463 A.2d 1017

**Leo PICCININI**

v.

**TEACHERS PROTECTIVE MUTUAL LIFE
INSURANCE COMPANY, Appellant.**

**Leo PICCININI, Appellant,**

v.

**TEACHERS PROTECTIVE MUTUAL LIFE
INSURANCE COMPANY.**

Superior Court of Pennsylvania.

Submitted Feb. 2, 1982.

Filed June 17, 1983.

520

Gregory S. Rubin, Philadelphia, for Teachers Protective Mutual Life Ins., appellant (at No. 1578) and appellee (at No. 1647).

Michael B.L. Hepps, Philadelphia, for Piccinini, appellant (at No. 1647) and appellee (at No. 1578).

Before WICKERSHAM, ROWLEY and McEWEN, JJ.

McEWEN, Judge:

This is a consolidated appeal from an order entered following a non-jury trial in favor of plaintiff Leo Piccinini, the insured under a health and accident policy issued by the defendant insurer, Teachers Protective Mutual Life Insurance Company (Teachers). Teachers has appealed the award of compensatory damages in favor of Piccinini in the amount of $27,783.40 plus interest and costs, asserting that it, the insurer, was entitled to avoid its obligations under the policy. Piccinini also appeals and asserts error in the failure of the trial court to award punitive damages. We decide that the uncontroverted evidence established, as a matter of law, that Piccinini had fraudulently obtained the insurance policy by misrepresenting his medical condition in the application for insurance and, accordingly, we reverse.

In October of 1976, Piccinini, a fifty-six year old cement finisher, filed an application for accident and health insurance with Teachers in which he made certain representations concerning the condition of his health. Piccinini, who was born in the United States and had an eighth grade education, completed the application with the assistance of his nephew who was an independent insurance broker. The nephew read each of the questions on the application in its entirety to Piccinini before eliciting any response from Piccinini. The application contains the signature of Piccinini and he concedes that his nephew accurately reported his responses to the questions on the application. That application form, as answered by Piccinini, appears in the record as follows:

APPLICATION FOR ACCIDENT AND HEALTH INSURANCE to the
**TEACHERS PROTECTIVE MUTUAL LIFE INSURANCE COMPANY**
LANCASTER, PENNSYLVANIA

PLAINTIFF'S EXHIBIT

1. Kind of Policy ............ Form No ............ Class ....
 Monthly Indemnity $ ............ Premium ............
 Elimination Period ............ A. ............ Q. ............ M. ............
 Riders ............ SA. ............

2. Name in full ............ Piccinini ............ Sex ..MALE..

3. What is your street address? ..4501 Ashburton St...
 Town? ..Phila... Zone? ..County? ............ State? ..Pa...

4. Age? ..56.. Date of Birth, Mo ............ Day ............ Year ............ Place of Birth ..Phila. Pa...
 What is your weight? ............ lbs. Height ............ ft, ............ in

5. Beneficiary ............ (wife)

6. What is your occupation? ..Cement finisher..
 What are your actual duties? ..finishing, Patios, Floors, Steps..

7. What is your employer's name? ............
 Address? ..511 Snyder Ave., Phila.. Nature of Business? ............

8. Do your average monthly earnings exceed the aggregate single monthly indemnity payable under the policy hereby applied for and all other similar policies now carried or applied for by you? ..yes..

9. Have you any other accident or sickness insurance or have you applied for any to this or any other companies? ..no..
 If so, name companies, and state the amount ............

10. Has any insurance company or association ever cancelled your insurance, rejected your application, offered a policy on a different plan or rate than applied for, or refused to renew or reinstate your policy, or do you now have an application pending with any other Company? ..no.. If so, give details? ............

11. Have you ever received or been refused benefits for disability? ..no.. If so, explain ............

12. Have you ever had a surgical operation or been advised to have one which has not been performed? ............
 Date and Details ............ All O.K. Now..

13. Have you any impairments? ..No.. Loss of sight or hearing? ..Ni.. Loss of arm or leg? ..No..
 Are you crippled or deformed? ..No.. If so, explain ............

14. Have you ever had or do you now have (a) diabetes, heart disease, rheumatism, arthritis, varicose veins, sacro iliac trouble? ..No.. (b) cancer, tuberculosis, goitre, rectal disease, syphilis or any other venereal disease? ..No..
 If so, give details ............

15. Have you within the past 5 years had any medical advice, treatment, or disabling injury or sickness? ..No..
 If so, give date, cause and length of disability ............

16. Are you now in good health and sound bodily condition? ..yes..

17. Do you represent each and all of the foregoing answers to be true and complete to the best of your knowledge and belief? ..yes..

Dated at ............ this ............ day of ............ 19.76

Witness ............

X ............ Signature of Applicant

After the application was forwarded to Teachers, and pursuant to company policy, Piccinini was called by an employee of Equifax, a company which investigated applicants on behalf of Teachers. When questioned at trial concerning his conversation with the investigator, Piccinini testified that he told the investigator that he was working and that he had back pains, and he further testified that he might have told the investigator about his hand tremors. Upon payment of a premium by Piccinini, Teachers issued a policy on October 25, 1976, which provided that in the event that Piccinini were to become disabled, Piccinini would

receive disability payments for sixty months. Seven months after the policy became effective, the insured suffered a heart attack and was rendered disabled under the policy. Teachers commenced making payments, but when it, during a routine investigation, uncovered medical history of the insured which appeared to be in direct contradiction to answers given by the insured on his application, Teachers ceased the payments in January of 1978, and rescinded the policy on the grounds that the insured had made false representations on the application. Piccinini then commenced this action by means of a complaint in assumpsit and trespass seeking compensatory and punitive damages. Teachers filed a counterclaim for payments that it had made to the insured pursuant to the policy.[1] The trial judge found that the insured did not knowingly or in bad faith make any false statements and that, therefore, the insurer was not entitled to cancel the policy.

■■■ Our appellate role is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. *Brenna v. Nationwide Insurance Co.*, 294 Pa.Super. 564, 567, 440 A.2d 609, 611 (1982); *Metz Contracting, Inc. v. Boxer Heights, Inc.*, 261 Pa.Super. 177, 180, 395 A.2d 1373, 1375 (1978). The findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as the verdict of a jury, and the findings will not be disturbed on appeal unless predicated upon errors of law or unsupported by competent evidence in the record. *Eddystone Fire Co. No. 1 v. Continental Insurance Cos.*, 284 Pa.Super. 260, 263, 425 A.2d 803, 804 (1981). Furthermore, the verdict winner is entitled to have the evidence considered in a light most favorable to himself.

1. The total of the payments made by Teachers to the insured pursuant to the policy and the amount of the counterclaim was $3,616.60. Teachers withdrew the counterclaim during the trial. Piccinini alleged in his complaint that he had paid premiums to Teachers in a total amount of $2,216.60.

*Marryshow v. Nationwide Mutual Insurance Co.*, 306 Pa.Super. 233, 237, 452 A.2d 530, 532 (1982).

The only information supplied by the insured on the application in response to questions concerning prior medical history were references to a gall bladder operation and a broken ankle. It is undisputed, however, that in the five years prior to the time the insured completed the application for insurance, he had been treated for medical problems on numerous occasions. At trial, counsel for Piccinini stipulated as to the accuracy of the following list of hospital admissions, surgeries and doctor's attention received by the insured for the years 1971 to 1976:

| 1971 | Treatment | Physician/Hospital |
|------|-----------|--------------------|
| 2/1 | Arthritis | Dr. Greenspon |
| 6/14 | Arthritis & Numb Hands & Feet | Dr. Greenspon |
| 12/21 | Arthritis | Dr. Greenspon |
| 12/31 | Distress, Upper Left Quadrant | Dr. Greenspon |

| 1972 | | |
|------|-----------|--------------------|
| 2/2 | Hand Tremor | Dr. Greenspon |
| 2/3 | GI Series | Dr. Morris Ivker |
| 2/4 | GI Series | Dr. Morris Ivker |
| 5/12 | Hand Tremor | Dr. Greenspon |
| 10/10 | Pain in Joints, Tremor Left Arm | Dr. Greenspon |
| 11/8 | Fatigue | Dr. Greenspon |
| 12/6 | Swelling of Right Hand | Dr. Greenspon |

| 1973 | | |
|------|-----------|--------------------|
| 1/5 | Hand Tremor | Dr. Greenspon |
| 2/9 | Hand Tremor | Dr. Greenspon |
| 3/9 | Facial Contusions | E.R., Nazareth Hospital |
| 4/11 | Hand Tremor | Dr. Greenspon |
| 5/2 | Hand Tremor | Dr. Greenspon |
| 5/30 | Hand Tremor | Dr. Greenspon |
| 6/22 | Low Back Pain | Dr. Greenspon |
| 6/29 | Back Pain | Dr. Greenspon |
| 8/10 | Hand Tremor, Back Pain | Dr. Greenspon |
| 10/1 | Back Pain | Dr. Greenspon |
| 11/14 | Back Pain | Dr. Greenspon |

| 1974 | Treatment | Physician/Hospital |
|------|-----------|--------------------|
| 1/16 | Recurrent Lumbar Strain, Tremor of Left Arm | Dr. Ball |
| 1/18 | Sacroiliac Strain | Dr. Greenspon |
| 4/15 | Pain in Left Shoulder & Arm | Dr. Ball |
| 4/19 | Pain in Left Shoulder & Arm, Tremor | Dr. Ball |
| 4/29 | Abrasion of Leg | E.R., Nazareth Hospital |
| 5/10 | Contusions & Abrasions of Left Leg | Dr. Ball |
| 8/13 | Enlarged Prostate, Dysuria and Retention | Dr. Ball |
| 9/16 | Lacerations of Leg | E.R., Nazareth Hospital |
| 9/18 | Treatment of Leg Wound | Dr. Ball |
| 10/4 | Treatment of Leg Wound | Dr. Ball |
| 11/4 | Treatment of Leg Wound | Dr. Ball |
| 11/18 | Treatment of Leg Wound | Dr. Ball |
| 12/9 | Treatment of Leg Wound | Dr. Ball |

| 1975 | | |
|------|-----------|--------------------|
| 2/12 | Urinary Tract & Epigastric Pain | Dr. Greenspon |
| 6/30 | Pain in Left Ankle | Dr. Ball |
| 9/3 | Back Pain, Prostatitis, Dysuria, Pain | Dr. Ball |
| 9/19 | Prostatitis, Back Pain | Dr. Ball |
| 10/22 | Back Pain | Dr. Ball |
| 10/27 | Examination of Urinary Tract | Dr. Camnitz |

| 1976 | | |
|------|-----------|--------------------|
| 1/29 | Cholangiogram | Dr. Jordon |
| 2/2 | Pain, Upper Left Quadrant | Dr. Ball |
| 3/10 | Epigastric Pain | Dr. Ball |
| 4/7 | Abdominal Pain | Dr. Ball |
| 5/5 | Abdominal Pain, Tremor of Left Arm | Dr. Ball |
| 6/7 | Static Tremor | Dr. Ball |
| 6/8 | Tremor, Parkinsonism, Conversion Reaction | Dr. Williams – VA Out-Patient Clinic |
| 6/16 | Treatment & Evaluation – Tremor & Psychiatric Problems | VA Out-Patient Clinic |
| 6/18 | Treatment & Evaluation – Tremor & Psychiatric Problems | VA Out-Patient Clinic |
| 6/28 | Treatment & Evaluation – Tremor & Psychiatric Problems | VA Out-Patient Clinic |

| 1976 | Treatment | Physician/Hospital |
|------|-----------|--------------------|
| 6/29 | Treatment & Evaluation – Tremor & Psychiatric Problems | VA Out-Patient Clinic |
| 7/26 | EEG | VA Out-Patient Clinic |
| 8/10 | Treatment & Evaluation – Tremor & Psychiatric Problems | VA Out-Patient Clinic |
| 9/1 | Static Tremor | Dr. Ball |
| 9/7 | Treatment & Evaluation – Tremor & Psychiatric Problems | VA Out-Patient Clinic |
| 10/15 | Static Tremor & Right Knee Pain | Dr. Ball |

In addition to this extensive medical treatment received by Piccinini within the five years prior to the time he applied for insurance coverage with Teachers, there was additional evidence introduced at trial which related to his medical history and his knowledge of his medical condition. Piccinini, a veteran of World War II, not only sought medical advice and treatment from the Veterans Hospital on numerous occasions, but he admitted at trial that less than two months prior to the time that he filled out the application for insurance, he had filed for a service-connected disability relating to a hand tremor. Furthermore, Dr. Greenspon, the physician who had treated Piccinini for a number of years, testified that on numerous occasions from 1947 to 1971, he had treated the insured for sacroiliac trouble and arthritis. In addition, Dr. Schmuck, a physician who treated Piccinini on numerous occasions at the Veterans Administration Hospital, testified that the insured was taking valium during the time that Dr. Schmuck examined him and that he diagnosed the hand tremor as a conversion reaction manifested by tremor of the left upper extremity. This conversion reaction was described as a psychological or psychiatric problem suffered by Piccinini which became for him a physical symptom. Dr. Schmuck also testified that this type of conversion reaction can become disabling depending upon the stress suffered by the patient.

Contrary to the testimony of Dr. Greenspon that he had informed his patient, both by means of simple language and through proper technical terms, that Piccinini suffered from

sacroiliac disease and arthritis, the insured testified that he never knew he had these diseases and that, therefore, he responded negatively to question fourteen on the application which asked whether the applicant had *ever* had certain diseases, including arthritis and sacroiliac trouble. Piccinini further testified that he gave a negative response to question fifteen which asked whether the applicant had "within the past five years had any medical advice, treatment or disabling injury or sickness?", because he interpreted question fifteen to ask whether he had received any medical advice or treatment in connection with a *disabling* injury or sickness. Thus, despite his medical history and notwithstanding the numerous visits to doctors, clinics and hospitals during the preceding five years, Piccinini felt that since he had concluded that his ailments were not disabling, the proper response to question fifteen was "No".

The distinguished Judge Lois G. Forer exercised painstaking care to conduct a fair trial and her thoughtful opinion reflects a very careful analysis of the basic issue presented, namely, did the insured knowingly and in bad faith make any false statements. The trial judge concluded that Piccinini had not done so. The scope of our appellate study in this case is to determine whether the trial judge could properly have concluded that there was no bad faith on the part of Piccinini when he responded to the crucial questions upon the application for insurance. We decide that the insured acted in bad faith when he responded to questions fourteen and fifteen.

 In order to avoid its obligations under an insurance policy, the insurer has the burden of proving that the statements made by an applicant on the application were false and material and that the applicant must have known that the statements were false and made them in bad faith. *Lynch v. Metropolitan Life Insurance Company*, 427 Pa. 418, 424, 235 A.2d 406, 409 (1967); *McCloskey v. New York Life Insurance Company*, 292 Pa.Super. 1, 5, 436 A.2d 690,

692 (1981); *Underwood v. Prudential Insurance Company of America*, 241 Pa.Super. 27, 31, 359 A.2d 422, 424–25 (1976). In addition, the insurer must establish that it relied upon the misstatements in issuing the policy. *Kizirian v. United Benefit Life Insurance Co.*, 383 Pa. 515, 519, 119 A.2d 47, 49–50 (1956); *Evans v. Penn Mutual Life Insurance Co.*, 322 Pa. 547, 553, 186 A. 133, 138 (1936); *McCloskey v. New York Life Insurance Co., supra* 292 Pa.Super. at 6, 436 A.2d at 692.

■ It is not enough for the insurer to show simple knowledge on the part of its insured that an answer is false, but rather, the knowledge of such falsity must be acted upon in bad faith. *Allstate Insurance Company v. Stinger*, 400 Pa. 533, 540, 163 A.2d 74, 78 (1960). "Mere mistakes, inadvertently made, even though of material matters, or the failure to furnish all details asked for, where it appears there is no intention of concealing the truth, does not work a forfeiture, and a forfeiture does not follow where there has been no deliberate intent to deceive, and the known falsity of the answer is not affirmatively shown." *Evans, supra* 322 Pa. at 553, 186 A.2d at 143.

■ While statements relating to medical treatment are material to the risk incurred by an insurer,[2] the failure to report every attendance or treatment by a physician does not alone constitute fraud, as for example, where the applicant does not include references to medical treatment received for common colds, indigestion or other comparatively minor illnesses. *Pfautz v. Sterling Insurance Company*,

2. "Generally, it has been held that 'every fact untruly asserted or wrongfully suppressed must be regarded as material if the knowledge or ignorance of it would naturally influence the judgment of the insurer in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of the premium.' " *Baldwin v. Prudential Insurance Co. of America*, 215 Pa.Super. 434, 437, 258 A.2d 660, 662 (1969) *quoting 7 Couch on Insurance 2d*, § 35:79, p. 94 (1961). *See also Underwood v. Prudential Insurance Company of America, supra.*

184 Pa.Super. 565, 135 A.2d 806 (1957). Thus, an applicant for insurance is not required to report illnesses or conditions which one would not ordinarily regard as being of real gravity or importance. *Travellers Insurance Co. v. Heppenstall*, 360 Pa. 433, 61 A.2d 809 (1948). Although a question as to whether a misstatement of fact was made in bad faith is ordinarily a question for the factfinder, *Baldwin, supra,*

> where it is established by uncontradicted documentary evidence that the insured has consulted physicians so frequently, or undergone medical or surgical treatment so recently, or of such a serious nature, that a person of ordinary intelligence could not have forgotten these incidents in answering a direct and pointed question in an application for insurance, bad faith may be inferred as a matter of law if the insured denies in his answer that any physician has been consulted, or any medical or surgical treatment has been received during the period of inquiry.

*Freedman v. Mutual Life Insurance Company of New York*, 342 Pa. 404, 409, 21 A.2d 81, 84 (1941); *quoted in McCloskey v. New York Life Insurance Company, supra* 292 Pa.Super. at 6–7, 436 A.2d at 692.

■■■ It is undisputed that appellant had been treated for sacroiliac disease and arthritis, and that he had visited various doctors, clinics and hospitals on numerous occasions in the five years prior to the time he completed the application for insurance. While Dr. Greenspon testified that he had informed Piccinini, both in layman's words and in technical terms, that he suffered from arthritis and sacroiliac disease, the court found "his testimony not worthy of credence" and concluded that "[w]ithout Dr. Greenspon's testimony, there is no evidence that plaintiff wrongfully answered Question 14" which asked whether he had ever had arthritis or sacroiliac trouble. Thus, the court concluded that the applicant did not respond in bad faith when he answered "No" to question fourteen. We decide, however,

that the insured could not have acted in good faith when he denied that he had any of the diseases listed in question fourteen. We are simply unable to believe that he was not aware that one of the conditions from which he was suffering and for which he sought treatment was arthritis, a common condition, especially when he had received treatment for that condition for so prolonged a period of years. Even when we accept the finding of the trial judge that the testimony of Dr. Greenspon was not worthy of credence, we find, based upon the uncontradicted evidence of his medical history and pursuant to the principles established in *Freedman, supra* and *McCloskey, supra,* the testimony of Piccinini is so incredible that his bad faith must be inferred as a matter of law.

We next consider whether question fifteen—"Have you within the past five years had any medical advice, treatment or disabling injury or sickness?"—is ambiguous. The trial court so concluded and found that a person who had been to a doctor for medical advice or treatment for a condition which was not a disabling injury or sickness would be justified in giving a negative answer to this question even though they had visited a doctor for medical advice or treatment within the past five years. The basis for those conclusions of the trial judge was the testimony of the insured himself. Even if, however, we decide that the question could be and had been so interpreted by the insured, we must determine whether he could reasonably believe that he had not received advice or treatment for a disabling injury or sickness.

This court has previously determined whether a particular question in an insurance contract is ambiguous. In *Orr v. Union Fidelity Life Insurance Co.,* 202 Pa.Super. 553, 198 A.2d 431 (1964), an insurance application asked the applicant to describe "any previous sickness, injury or any medical or surgical treatment..." The applicant listed only one of many injuries suffered by him. When the insurance

company attempted to rescind the policy by reason of the failure of the insured to list his other injuries, the insured responded with the assertion that he interpreted the word "any" to mean any one, and not all, previous injuries or treatments. The *Orr* court rejected this explanation offered by the insured and found, as a matter of law, that the answer which described only one of numerous known injuries was not a truthful answer to the question.

Similarly, we conclude as a matter of law that the negative answer to question fifteen was supplied by the insured in bad faith. Even if we were to accept his assertion that he and his independent insurance broker-nephew interpreted the question to mean that only information relating to medical advice or treatment which related to a *disabling* injury or sickness was being elicited, when we consider that less than two months prior to the time that he completed the application, Piccinini had applied to the Veterans Administration for compensation for a service connected disability relating to his hand tremor, we are compelled to the conclusion that the response was provided in bad faith. It is inconceivable that Piccinini, whose trade of cement finisher required considerable skill and hand dexterity, could in response to this inquiry overlook so serious a condition as a hand tremor that inspired his application for a disability rating and payments just two months earlier.

Since we have decided that the insurer is entitled to rescind the policy by reason of our finding that Piccinini acted in bad faith in providing responses to questions fourteen and fifteen, we need not decide whether the affirmative response of appellee to question sixteen—"Are you now in good health and sound body condition?"—would also entitle the insurer to rescind the policy.

Order reversed. Jurisdiction is relinquished.