# McEvoy v. American Bankers Insurance Group

C.P. of Lancaster County, no. 4597 of 1993.

*Michael S. Grab,* for plaintiff.
*Randall C. Schauer,* for defendant.

PEREZOUS, *J.,* July 9, 1996—Before us for disposition is the motion for summary judgment of defendant, American Bankers Insurance Group, in the action of plaintiff, decedent's widow and administratrix of decedent's estate, seeking damages for failure to pay on a putative contract of life insurance issued in decedent's name less than two months before his death. Because we find, albeit reluctantly, that decedent's false statements on his "application for insurance" were made knowingly and/or in bad faith, we grant insurer's motion and hold the contract to be rescinded,[1] the insurance certificate to be void, and ABIG to have no liability thereunder once it has returned to the estate the premium paid plus interest thereon calculated as the greater of either the legal rate or the actual investment return during the period from November 11, 1991 to present.

Our Supreme Court has stated the standard applicable to this ruling as follows:

---

1. Pursuant to clarification by our Supreme Court, it is clear that "rescission," not "cancellation," of the insurance policy is the remedy sought. We note that the result of either remedy is to void the policy. *Erie Insurance Exchange v. Lake,* 343 Pa. 363, 367, 671 A.2d 681, 683 (1996).

"Summary judgment is granted properly when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Pa.R.C.P. 1035(b). Summary judgment is appropriate only in those cases which are clear and free from doubt. *Musser v. Vilsmeier Auction Co. Inc.*, 522 Pa. 367, 370, 562 A.2d 279, 280 (1989). The record must be viewed in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Marks v. Tasman,* 527 Pa. 132, 135, 589 A.2d 205, 206 (1991)." *McConnaughey v. Building Components Inc.,* 536 Pa. 95, 98, 637 A.2d 1331, 1333 (1994).

Even the strictest possible construction of the summary judgment standard[2] cannot avoid the conclusion that moving defendant ABIG has dispelled all doubt as to the existence of any material fact, and is entitled to summary judgment.

### Factual Record

Based on the record, we note the parties' basic agreement as to the following facts and circumstances surrounding this dispute.

---

2. The court takes judicial notice that the essence of Pa.R.C.P. 1035 has been retained in the revised rule bearing numbers 1035.1-1035.5 which became effective July 1, 1996. To the extent new language appears, we view the changes, many of which adopt accepted practice in this area, as a clarification. Therefore, under either the pre-revision construct briefed by the parties or the new language, our analysis and conclusion remain the same.

(1) On November 6, 1991, decedent submitted an application for credit life insurance with defendant to insure satisfaction of the McEvoys' then existing mortgage;

(2) At the time he submitted the application, he was insured for the same purpose under a substantially similar policy purchased on December 6, 1989;

(3) The 1989 policy terminated when the McEvoys refinanced their mortgage in 1991;

(4) The 1991 policy became effective on or about November 11, 1991 in the amount of $28,440.85 coverage;

(5) Since 1989 at the latest, decedent had presented with and sought treatment for a variety of medical problems, including, inter alia, high blood pressure (hypertension), hardening of the arteries (ASD), high cholesterol, dizziness, chest pains, arthritis (back and neck);

(6) On January 6, 1992, decedent died at Lancaster General Hospital as a result of brain surgery due to a cerebral infarction (stroke);

(7) After investigation uncovered a medical history which would have rendered decedent ineligible for credit life insurance had he revealed it, on March 16, 1992, defendant denied the claim for benefits based on decedent's response of "no" to the two general health questions on the credit life application.

The sole question before us concerns the significance of decedent's negative responses. More precisely, the pending issue is whether those responses permit defendant as a matter of law to void the insurance coverage. We first review the application language[3] before con-

---

3. Before the court is the first page of what appears to be a two-sided document. However, as neither party has provided the reverse side, either in the complaint or in the present moving papers, we base this ruling on the information available.

sidering decedent's state of health at the time he completed the application.

Applicants for credit insurance exceeding $10,000 were required to respond "yes" or "no" to the following inquiry:

"During the past five years, have you consulted with or been treated by a doctor for any of the following:

"(1) Stroke, cancer or malignant tumor; diabetes; acquired immune deficiency syndrome (AIDS) or AIDS-related complex (ARC), hypertension; abnormality of the heart, circulatory system, brain, liver, kidney, lungs or stomach?

"(2) Nervous, mental or seizure disorders, arthritis, sciatica, depression, ulcer, back trouble or back pain?"

Decedent responded "no" in each case by placing a checkmark in the appropriate box. Continuing down the page, the next relevant language encountered by the applicant reads:

"I understand that to be eligible for the insurance applied for, the foregoing representations must be true and correct, and if same be not true, then I am not eligible for insurance for which this application is made. In the event of a claim under such certificate, I hereby authorize any physician and/or hospital to disclose to Arcadia National Life Insurance Company all medical history for the five years just prior to the date of this agreement."

Finally, below the signatures of both decedent and his wife and co-borrower, plaintiff herein, appears the following admonition:

"LIFE: IF QUESTION NO. 1 IS ANSWERED 'YES,' DO NOT ISSUE CREDIT LIFE OR DISABILITY COVERAGE FOR THAT INSURED."

We have no choice but to find, in light of decedent's failure to admit to an extensive medical history since 1989, that defendant has met its burden of establishing misrepresentation and/or fraud.

### Scienter: Issue Of Fraud Or Bad Faith

The nub of plaintiff's argument in opposition to summary judgment is that Mr. McEvoy did not know that *hypertension* meant high blood pressure when he completed the application; therefore, decedent's ignorance of the meaning of terms contained in the application vitiates his responsibility for denying he had high blood pressure. However, both the following analysis and, indeed, our review of the facts, belie this rationale.

To prove misrepresentation and/or fraud sufficient to avoid liability on its life insurance policy, defendant must show (1) a false declaration by applicant; (2) subject matter material to the risk; and (3) applicant knew of falsity or made declaration in bad faith. *Levin v. Metropolitan Life Insurance Co.,* 381 Pa. 615, 114 A.2d 330 (1955); see *The Equitable Life Assurance Society of the U.S. v. Bordner,* 1994 WL 52757 (E.D. Pa. 1994). That defendant has established the first two elements cannot seriously be disputed, for (a) the parties agree that decedent suffered from high blood pressure, and (b) the face of the application makes clear that divulging the high blood pressure would have resulted in refusal to issue insurance. Therefore, our inquiry focuses on whether decedent knew that his answer was false or made the statement in bad faith. *Wolfson v. Mutual Life Insurance Co. of New York,* 455 F. Supp. 82 (M.D. Pa. 1978).

Because a showing of either *bad faith* or *knowing falsity* suffices to establish scienter, we turn first to bad faith. We distinguish *Grimes v. Prudential Insurance*

*Co. of America,* 401 Pa. Super. 245, 585 A.2d 29 (1991) and hold that the parameters of bad faith do not permit applicants to benefit from their own ignorance or, as might be more aptly stated in this instance, their willful failure to make even the smallest effort to become informed.

Although the *Grimes* facts appear superficially similar to those at hand—summary judgment by defendant insurer which had denied claim on life insurance policy based on misrepresentation of medical history on the application—close examination reveals critical differences. First, plaintiff therein might well have been unaware that her three successive years of three doctor visits per year "were anything more than regular checkups," whereas decedent's list of doctor visits and medical procedures totalled several dozen[4] from 1989, including MRI of the brain, stress test, echocardiogram and carotid doppler tests, CT of the brain, and x-rays of the lumbar spine, all of which clearly take decedent's treatment history out of the realm of regular checkups. Secondly, whereas Mrs. Grimes may have been asymptomatic, Mr. McEvoy was indisputably experiencing acute symptoms ranging from dizziness to back pain. Thirdly, while Mrs. Grimes' doctor "had told her that her blood pressure was satisfactory," nothing in the record disputes defendant's position that Dr. Romano had regularly informed decedent that his blood pressure was a serious problem that they had to try to control.[5]

---

4. He visited Dr. Romano's office 20 times during a four month period in 1990.

5. The point is best illustrated by the *Grimes* court's review of its facts:

"In view of the fact that the applicant's appearance for checkups had been at her physician's request; that the visits had been uneventful and entailed neither dramatic testing nor treatment; that she, herself,

The record, particularly the deposition testimony and attached treatment records of Eugene J. Romano D.O., decedent's primary care physician, leaves no room for doubt that decedent knew he was sick—his numerous doctor visits, prescription medicines, specialist referrals, and sophisticated diagnostic tests assure as much.[6] This is true even if, interpreting the record in the light most favorable to plaintiff, we believe that decedent did not know that "hypertension" is the medical term for "high blood pressure" and, therefore, did not lie on the application. Even assuming *arguendo* that decedent misunderstood the term *hypertension,* he should have responded "yes" based on his recent history of medical problems denoted by such common terms as "circulatory system," "brain," "arthritis," "back trouble or back pain." The record is replete with enough incontrovertible evidence as to strain beyond the breaking point plaintiff's contention that decedent was not, at minimum, acting in bad faith by responding to questions he did not understand.

As for plaintiff's recitation of the rule that, "[o]rdinarily, whether a misstatement of fact was made in bad faith is an issue of fact for the jury," *Grimes, supra*

---

had experienced no discomfort and had not, at her instance, consulted or sought treatment; and that her physician, on her last visit, had told her that her blood pressure was satisfactory, it cannot be said as a matter of law that her failure to refer to her hypertension or disclose her office visits between February 1982 and March 1985 was intended to deceive the insurance company." *Id.* at 252, 585 A.2d at 33.

6. The rule in *Nanty-Glo Borough v. American Surety Co.,* 309 Pa. 236, 163 A. 523 (1932) (where the testimony of the party having the burden of proof is oral, the credibility of that testimony is always for the jury) is inapposite where ABIG relies not only on Dr. Romano's deposition, but also on the uncontradicted medical records attached as exhibits to his transcript.

at 249, 585 A.2d at 31, we take judicial notice of the failure to note the accompanying exception, restated in *Grimes,* which happens to be quite applicable here:

"[W]here it is established by uncontradicted documentary evidence that the insured has consulted physicians so frequently, or undergone medical or surgical treatment so recently, or of such a serious nature, that a person of ordinary intelligence could not have forgotten these incidents in answering a direct and pointed question in an application for insurance, bad faith may be inferred as a matter of law if the insured denies in his answer that any physician has been consulted, or any medical or surgical treatment has been received during the period of inquiry." *Piccinini v. Teachers Protective Mutual Life Insurance Co.,* 316 Pa. Super. 519, 530, 463 A.2d 1017, 1024 (1983). (citations omitted)

The *Levin* case, *supra* at 616, 114 A.2d at 330, places this exception in its proper relation to the so-called rule:

"Whether the answers were false and fraudulent is under certain circumstances a question for the jury, and under other circumstances a question of law for the court." (citations omitted)

For the reasons noted herein, we find sufficient documentary evidence to activate this exception requiring the court to make a determination.

Three additional factors guide our consideration of the bad faith issue. First, decedent signed the application *together with his wife,* plaintiff herein. Even if the significance of certain terms was lost on him, it is implausible that his life partner, who presumably endured his myriad ailments since 1989, was equally unaware. Secondly, it is well-established that placing one's signature on a document intending to have it relied upon represents the adoption of statements contained therein,

even if someone subsequently claims not to have read what was subscribed to. *Denlinger Inc. v. Dendler,* 415 Pa. Super. 164, 180 n.9, 608 A.2d 1061, 1069 n.9 (1992) ("failure to read is an unavailing excuse or defense"); *Van Riper v. Equitable Life Assurance Society of U.S.,* 561 F. Supp. 26 (E.D. Pa. 1982), *aff'd,* 707 F.2d 1397 (3rd Cir. 1983). Thirdly, in light of the fact that applicants knew that a truthful "yes" response would result in denial of the application, we are especially loath to impliedly approve the attitude, "what I don't know can't be held against me." If decedent and plaintiff were truly uninformed—which the court finds quite difficult to accept—then to an even greater degree had they the obligation to make *some* inquiry before responding as they did.[7] Failure to do so represents bad faith beyond any genuine issue of material fact.

Finding bad faith makes it unnecessary to inquire whether the misrepresentations were intentional. However, we note that the record contains several instances of decedent's primary treating physician stating that he would have used layman's terms in describing medical conditions in terms the decedent could readily understand.[8] And, as noted previously, many terms on the application were already stated in their "common" form. In sum, it would be disingenuous for someone on *blood* pressure medication who experienced symptoms such as *dizziness,* a peptic *ulcer,* and *ringing* in the ears, plus who had a family history of strokes, *not* to recognize that these were not normal, but rather indicated abnormality of the circulatory system, brain or stomach.

---

7. We reject as untenable the argument that decedent's false statements were immunized where declared to be "true and complete to the best of my knowledge and belief. . . ."

Defendant has disposed of the material issues and dispelled all legally cognizable doubt regarding decedent's life insurance application. ABIG was entitled to rely upon the truth of decedent's declaration when it undertook to insure his life. The risk undertaken was, at least to the degree possible by removing certain higher risks from the pool, a known, actuarial risk. Thus, decedent's misrepresentations permit the insurer to avoid liability on risks which it never agreed, nor would have agreed, to insure. *Metropolitan Property and Liability Insurance Co. v. Insurance Commissioner of Pa.*, 525 Pa. 306, 580 A.2d 300 (1990); see *Blair v. Berkshire Life Insurance Company*, 429 F.2d 996 (3rd Cir. 1970). Decedent's failure to fulfill his disclosure obligation permits ABIG to rescind an insurance obligation that was contingent on decedent's candor.

Without question, Mr. McEvoy's death was a tragedy for his family and, unfortunately, one made no easier to bear by our ruling that his misrepresentations permit ABIG to void the contract. We are convinced that the policy would never have issued but for the false statements in the application. Moreover, plaintiff herein, as a co-signatory to the application, cannot be surprised that her claim resulted in an inquiry, for such is clearly stated on the face of the document.

For all the foregoing reasons, upon consideration of all pleadings and papers relevant to defendant's motion and plaintiff's opposition thereto, the court enters the following:

---

8. This was particularly true in the case of decedent, whom Dr. Romano candidly acknowledged was "not bright. There's no other way to put it." The doctor clearly had his own interest in effective communication to the extent necessary to meet his duty to obtain informed consent to treatments prescribed.

492

## ORDER

Defendant's motion for summary judgment is granted, and judgment entered in favor of defendant, ABIG, and against plaintiff, Barbara R. McEvoy, individually, as well as in her capacity of administratrix, consistent with the foregoing opinion.

