## United National Insurance Co. v. J.H. France Refractories Co.

*Elizabeth Fox,* for plaintiff.
*Mark Turetsky,* for defendants.

CAESAR, *J.,* December 17, 1996—The instant proceeding, which has been the subject of a landmark decision by the Pennsylvania Supreme Court, involves an insurance company's action to rescind a liability insurance policy issued to a manufacturer of refractory products on the ground of fraud.

Based upon the extensive trial proceedings in this case, the court finds that the insured, J.H. France Refractories Co., and its subsidiary companies, procured excess insurance coverage from the insurer, United National Insurance Company, by means of making fraudulent representations and through fraudulently concealing material information relating to the usage of asbestos within products and the state of litigation involving asbestos.

## A. PROCEDURAL POSTURE

The plaintiff, United National Insurance Company, initially filed a complaint on October 30, 1987 seeking rescission of an excess liability policy issued to J.H. France Refractories and its subsidiaries and affiliates,

The Van Brunt Company, Mineral Industries Inc., and Green Point Fire Brick Company.

The complaint was subsequently amended and trial proceedings were held before this court on November 9 to November 13, 1989. At the conclusion of United National's testimony, France made a motion for nonsuit predicated upon the statute of limitations and the doctrine of laches. (Trial Record, November 13, 1989 at 86-87.)

The trial court entered a finding in favor of France on January 4, 1990, holding that the insurer's action was barred by the statute of limitations. The court thereafter amended this order on May 15, 1991 by entering a compulsory nonsuit against United National and in favor of all of the defendants.

In conjunction with the January 1990 order, the court entered findings of fact and conclusions of law addressing the grounds advanced by United National underlying its action for rescission. Pursuant to the foregoing, the trial court set forth detailed and comprehensive findings supporting United National's claim that France had knowingly made false statements and representations in procuring the excess coverage. Thus, the court found that although the insurer had set forth facts satisfying the elements required for rescission, the action was barred under the statute of limitations.

Following the entry of the nonsuit, United National appealed to the Pennsylvania Superior Court which affirmed the trial court's decision in a published opinion. See *United National Insurance Co. v. J.H. France Refractories,* 417 Pa. Super. 614, 612 A.2d 1371 (1992).

The Pennsylvania Supreme Court granted allocatur and subsequently reversed the trial court's ruling, interpreting 42 Pa.C.S. §5524 and finding that the equity action was not time barred under the statute of limi-

tations. The Supreme Court remanded the case for a hearing on France's claim that the action should be precluded under the doctrine of laches. *United National Insurance Co. v. J.H. France Refractories,* 542 Pa. 432, 668 A.2d 120 (1995).

In accordance with the Supreme Court's adjudication, the trial court heard testimony on the issue of laches on April 1, 1996. After carefully evaluating the arguments advanced by France, the trial court, in a memorandum and order dated May 29, 1996, denied the defendant's motion for nonsuit. In so holding, the trial court found that France failed to establish by credible evidence that prejudice ensued from the delay associated with instituting suit in the present action. (The May 29, 1996 order is appended hereto as exhibit no. 1.)

In denying the defendant's motion to dismiss on the ground of laches, the court concomitantly scheduled further hearings to enable France to call additional witnesses on its behalf. On September 25-26, 1996, testimony was elicited from John Goertz, a principal officer of the defendant at the time of the application for the excess liability policy. The notes of testimony from all of the prior hearings were adopted as part of the record.

Given that the testimony is complete and that France has now been afforded the opportunity to call any additional witnesses on direct examination, the case is in a posture for a final resolution upon the merits.

## B. FACT-FINDINGS

The court heard extensive testimony from witnesses both favorable and adverse to France prior to entering the nonsuit in favor of France in 1991 and findings of fact in favor of United National.

Specifically, at the initial trial proceeding, United National elicited testimony on direct examination from the following individuals: Gerard Durkin, vice president of claims at United National; William Schock, a former vice president for Tri-State General Insurance Agency; Ronald Hihn, previously an underwriter with and currently the president of Doran Excess Underwriters; and John LaRosa, the principal of Main America Incorporated.

France, through Goertz, had initially contacted John LaRosa (Main America Inc.) to purchase excess liability coverage. LaRosa then contacted an intermediary broker, Tri-State General Insurance Agency, which in-turn obtained the insurance coverage through Doran Excess Underwriters, the managing general agent for United National Insurance Company.

While Ronald Hihn testified as a witness for United National, both LaRosa and Schock were agents of France in the procurement of the insurance policy. Before the initial fact-findings were entered, France had ample opportunity to question all of these witnesses on cross-examination and its questioning was comprehensive.

At the hearing on September 25-26, 1996, France opted to call only one additional witness, John Goertz. After carefully evaluating Mr. Goertz's testimony within the context of the testimony of all of the other witnesses in the prior trial proceedings, the court does not find any circumstances or credible evidence which would change its findings on the issue of fraud. On the contrary, Mr. Goertz's testimony is highly damaging to France's position and only further establishes that France perpetuated a fraud upon United National when application was made for the excess liability coverage.

In light of the extensive fact-findings previously made by this court on January 4, 1990, detailing the relevant parts of the record establishing intentional misrepresentations of material fact by France, the court hereby incorporates them as if set forth fully herein. (They are appended hereto as exhibit no. 2.)

Supplementing the seven specific fact-findings previously entered, the court also adopts the following additional findings, taking Mr. Goertz's most recent testimony into consideration in conjunction with the other testimony:

"(1)-(7) See findings of fact entered January 4, 1990 attached hereto as exhibit no. 2.

"(8) Prior to the time that France made application for excess coverage from United National, John Goertz, who was responsible for handling claims instituted against France, *was personally aware* of asbestos-related claims in which France was either initially named as a defendant or later joined as a defendant in the following actions: (1) a lawsuit filed in 1979 in the *Temple* case (Record, September 25, 1996 at 57-59); (2) a lawsuit initiated in the Commonwealth of Pennsylvania by Joseph Inverso and at least 26 other plaintiffs in 1979 (Record, September 25, 1996 at 94-95, P-137); (3) a lawsuit instituted in the Commonwealth of Pennsylvania in June 1980 by William Ellis (Record, September 25, 1996 at 100, P-138); (4) a lawsuit filed by Frank Jarusewicz in Middlesex County, New Jersey in September 1980 (Record, September 25, 1996 at 103, P-140); (5) a lawsuit initiated by the executrix of Charles Sylvester in 1980 (Record, September 25, 1996 at 106, P-141); (6) a lawsuit instituted in the Commonwealth of Pennsylvania by Frank Amato in March 1982 (Record, September 26, 1996 at 7, P-143); (7) a lawsuit initiated by George Nickell in the United States District

Court for the District of Maryland in March 1982; (8) a lawsuit filed by Ulysses Arrington in the District Court for the District of Maryland in March 1982 (Record, September 26, 1996 at 9, P-145); (9) a lawsuit instituted by John Bugglen in the United States District Court for the District of Maryland in March 1982 (Record, September 26, 1996 at 9, P-146); (10) a lawsuit initiated by Clarence Rouse in the United States District Court for the District of Pennsylvania in 1981 (Record, September 26, 1996 at 10, P-147); (11) and a lawsuit filed by Wilbur Henson and more than five other individuals in the United States District Court for the District of Maryland in August 1981.

"The lawsuits instituted in *Nickell, Arrington* and *Bugglen* were filed by bricklayers at the Sparrows Point Division of the Bethlehem Steel Corporation. They are referenced throughout the record as the Bethlehem Steel cases.

"(9) In the course of processing the liability claims set forth in the above-mentioned cases, John Goertz personally communicated and corresponded with multiple liability carriers. (See immediately preceding citations to record.)

"(10) William France Sr. and William France Jr., chief executive officers of France, were aware of the use of asbestos in products produced by France and discussed its usage with John Goertz prior to the time application was made for the excess coverage. (Record, September 25, 1996 at 46-47.)

"(11) John Goertz personally played an integral role in the initiation of the action for declaratory relief instituted by France against Allstate after that insurer denied coverage in the *Temple* suit for injuries and damages resulting from the use of products containing asbestos. (Record, September 25, 1996 at 59.) This

action preceded the application for insurance that France procured through United National.

"(12) John Goertz was aware that France distributed asbestos products other than Franco Therm which contained asbestos and posed potential dangers at the time that the application was made for insurance coverage from United National. (Record, September 25, 1996 at 79.)

"(13) John Goertz and other officers of France were aware of the dangers and diseases associated with asbestos usage and aware of the difficulties in obtaining liability coverage to cover potential claims and intentionally withheld information about the use of Franco Therm and other products containing asbestos despite Goertz's testimony to the contrary.

"(14) France opted to retain John LaRosa from Main America Incorporated as a broker to procure excess liability coverage rather than Alexander and Alexander, which had previously secured liability coverage, and was aware of the use of asbestos and claims that have ensued therefrom. (Record, September 26, 1996 at 14-17.) As early as October 1981, inquiries had been directed to Alexander and Alexander concerning claims involving asbestos, making said insurance broker aware of France's use of Franco Therm. (Record, September 26, 1996 at 17.) By proceeding through LaRosa rather than Alexander and Alexander, France was more readily able to conceal this information.

"(15) Within less than a half year before applying for excess coverage through United National, France had answered questioning from Wausau, a prior insurance carrier, to the effect that it had utilized Franco Therm from 1956-1972. Thus, France was cognizant of the significance of this issue to liability insurers

and with the associated underwriting risks. (See Record, September 26, 1996 at 16-17.)

"(16) John Goertz, on behalf of France, contacted John LaRosa about obtaining excess liability coverage and an application was submitted through LaRosa in June 1982, only several months after the *Amato, Nickell, Arrington* and *Bugglen* suits were initiated and within several years of the actions instituted in *Sylvester, Jarusewicz* and *Henson.*

"(17) John Goertz and France intentionally concealed information about the existence of asbestos claims in a majority of these cases from its own broker, John LaRosa, as well as the intermediary brokers and United National with the intention of procuring additional coverage it would have otherwise been unable to obtain. Concerning this matter, Goertz professed that he had no recollection of whether he disclosed information to Mr. LaRosa, his own broker, about 11 asbestos-related lawsuits that had been instituted prior to the time of application for excess coverage. (Record, September 26, 1996 at 29.) This supports Mr. LaRosa's testimony that he did not receive information about a series of complaints previously instituted in which France was a defendant. This included the *Temple* lawsuit. (Record, November 13, 1989 at 19-21.)

"(18) John Goertz concealed information about the asbestos allegations underlying two lawsuits listed as product losses in the insurance application to United National by advising LaRosa in ambiguous terms that the cases related to 'some sort of lung condition.' (Record, September 26, 1996 at 56, November 13, 1989 at 570.)

"(19) Mr. LaRosa (based upon his own testimony) would have made disclosure about the *Temple* lawsuit and other asbestos lawsuits instituted in 1980 and 1981

had he been advised about their existence by Mr. Goertz. (Record, November 13, 1989 at 51.) Goertz concealed this information from his own broker and in-turn United National was never advised of these lawsuits.

"(20) When the binder was issued on the excess policy placed through United National, it specified the requirement for a confirmation that there was no involvement with asbestos. Inquiries were made concerning this matter, and France, by and through its employees and agents, withheld information about the lawsuits. (Record, September 26, 1996 at 43-52.)

"(21) When France, while in the process of applying for excess liability coverage, disclosed that there had been a claim in the Bethlehem Steel cases for some sort of lung condition, no disclosure was made that the underlying actions were for alleged damages attributable to asbestos usage even though Goertz and other officers of France were clearly aware of this fact. Goertz, himself, personally participated in the defense of these actions. (Record, September 25, 1996 at 54.) Goertz, himself, acknowledged that he failed to reveal the nature of the lung condition to his own broker, LaRosa. (Record, September 26, 1996 at 56-57.)

"(22) Due to the risks associated with asbestos usage in products manufactured by France, an inspector from the Department of Labor and Industry advised the company of those dangers at some time preceding France's application for excess coverage. (Record, September 26, 1996 at 75-76.) The warnings prompted France to discontinue the usage of asbestos in its products and clearly placed it on notice of this material risk.

"(23) Despite his ambiguous replies to questioning on the matter, the court finds that prior to the time that the application was submitted for excess coverage, Goertz was aware that mesothelioma was a cancer

caused by asbestos. (Record, September 25, 1996 at 75.) By virtue of the allegations in the *Temple* case that the plaintiff was afflicted by mesothelioma and given Goertz's knowledge concerning the condition, it was evident that Goertz was clearly aware of France's exposure. To the same effect, the court finds that Goertz was generally aware of the meaning of asbestosis and malignant pleural mesothelioma which were alleged in the *Rouse* case. (Record, September 26, 1996 at 11-12.) Thus, France was aware of the risks and claims about serious medical conditions emanating from asbestos usage in claims and lawsuits in which it had already been implicated.

"(24) United National would not have issued the excess liability coverage applied for had it been aware of the numerous lawsuits relating to asbestos that were never disclosed and had it been aware of the grounds underlying the lawsuits in the Bethlehem Steel cases. Ronald Hihn, on behalf of Doran Excess Underwriters, the underwriter for United National, expressly attempted to obtain information as to whether France utilized asbestos since he was not in a position to underwrite policies which issued against asbestos claims. (Record, November 10, 1989 at 8, 14, P-23.)"

## C. LEGAL DISCUSSION

It is a long-standing principle in this Commonwealth that an insurance policy is voidable by an insurer upon a finding that an insured had fraudulently misrepresented material information. *Metropolitan Property and Liability Insurance Co. v. Insurance Commissioner of Pennsylvania,* 525 Pa. 306, 310, 580 A.2d 300, 302 (1990).

As held by the Superior Court in this very same case, in order to rescind an insurance policy for fraud, a plaintiff must prove three elements:

(1) a false application statement;

(2) on a subject material to the risk to be insured against;

(3) the applicant's knowledge that the statement was made in bad faith or was untrue. *United National Insurance Co., supra* at 627, 612 A.2d at 1377, *rev'd on other grounds,* 542 Pa. 432, 668 A.2d 120 (1995); citing *Allstate Insurance Co. v. Stinger,* 400 Pa. 533, 541, 163 A.2d 74, 76-77 (1960); *A.G. Allebach Inc. v. Hurley,* 373 Pa. Super. 41, 52, 540 A.2d 289, 294 (1988).

For purposes of this rule, a representation is material if the insurer would not have insured the party had it known about the concealed information, if the information would have caused the insurer to demand a higher premium, or if the information would have affected the insurer's ability to evaluate the degree and character of the risk. *Montgomery v. Federal Insurance Co.,* 836 F. Supp. 92 (E.D. Pa. 1993) (applying Pennsylvania law).

Applying the foregoing principles to the case at bar, the court finds that United National has set forth facts establishing grounds for rescission of the excess liability policy at issue. The testimony adduced at trial and evidence clearly demonstrate that France's corporate officers were aware of the company's use of asbestos and the risks ensuing therefrom and the plethora of asbestos-related lawsuits instituted naming the company as a defendant before application was made to United National for the excess policy.

The decision to apply for $5,000,000 in excess liability insurance over and beyond both a primary and

umbrella policy in effect was made almost immediately after the company became aware of actions initiated against it in at least four asbestos cases and within several years of the initiation of three other asbestos cases.

It was evident to this fact-finder that John Goertz, with the acquiescence of the other officers of France, intentionally concealed information about the existence of numerous asbestos actions from its own agent as well as from the intermediary brokers and the insurer. Furthermore, the information conveyed about lawsuits involving "some type of lung condition" was intentionally vague and intended to deceive the insurer.

The misstatements were clearly made in bad faith as Goertz and the other corporate officers of France were cognizant of the risks associated with asbestos and the underwriting risks ensuing therefrom. The evidence points out that Goertz and other corporate officers of France were aware of the allegations in several of the complaints relating to mesothelioma resulting from asbestos exposure and the potential for enormous liability.

It is with no surprise that France, in an attempt to conceal this information, proceeded to secure excess liability insurance through LaRosa rather than through a prior broker who was aware of France's exposure and involved in a number of the prior suits instituted.

Concealment of information concerning the use of Franco Therm, distribution of asbestos products, and about the large number of lawsuits instituted against France was undertaken with the intent of causing reliance by the insurer and was undoubtedly material to the risk assumed. Clearly, as required by *Piccinini v. Teachers Protective Mutual Life Insurance Co.,* 316 Pa. Super. 519, 529, 463 A.2d 1017, 1024 (1983), the

insurer established that it relied upon the misstatements in issuing the policy. No such excess liability policy would have been issued without an asbestos exclusion.

The case at bar is not one in which an unsophisticated consumer unwittingly made an unintentional misrepresentation in submitting an insurance application. Nor is this a case in which an insurance company attempted to confuse an ignorant insured with a long and complicated policy application. See *Hurley, supra* at 51, 540 A.2d at 294. (The court considered this to be a pertinent factor when assessing a misrepresentation made by an insurance agent in an application for an errors and omission policy.) Here, the insured is a sophisticated business who calculatingly concealed material information.

Although most of the arguments advanced in France's trial brief are without merit given the circumstances underlying the instant action and do not warrant further attention, the court addresses France's third argument, namely that United National should be estopped from seeking rescission on the basis of third party claims under the policy at issue.

In support of this theory, France argues that the denial of coverage will adversely affect aggrieved claimants afflicted by medical conditions emanating from asbestos exposure. To advance its position, France cites a series of holdings in cases discussing rescission in the context of automobile insurance, namely: *Klopp v. Keystone Insurance Companies,* 528 Pa. 1, 595 A.2d 1 (1991); *Strickler v. Huffine,* 421 Pa. Super. 463, 618 A.2d 430 (1992); *Powell v. Walker,* 428 Pa. Super. 31, 630 A.2d 16 (1993); and *Erie Insurance Exchange v. Lake,* 432 Pa. Super. 330, 638 A.2d 250 (1994).

France's reliance upon these cases is misplaced since their holdings exclusively apply within the context of automobile coverage, which is encompassed by a spe-

cific statutory body of law expounded by the legislature.[1] Due to the unique issues and public policy concerns involving automobile insurance, the legislature promulgated Act 78 which is found at 40 P.S. Section 1008.1 et seq. Relying upon Act 78, the State Supreme Court, most recently, in *Erie Insurance Exchange v. Lake,* 543 Pa. 363, 671 A.2d 681 (1996) prohibited an insurer from rescinding an automobile insurance policy which had been in effect for more than 60 days to preclude third parties from making claims under it.[2]

The holding in *Erie* is neither controlling nor relevant to the case at bar since it was predicated solely upon Act 78 and the remedial objectives underlying its enactment. As explained by Justice Cappy, the author of the plurality opinion, the legislature enacted Act 78 with the intent of limiting the insurance industry's use of the common-law remedy of rescission due to the disparate bargaining power between the insurer and insured in the context of automobile insurance. *Id.* at 372, 671 A.2d at 685-86. The Act was further intended to redress potential abuses and practices by the insurance industry directed against disadvantaged consumers.[3] In

---

1. France overlooks the recent appellate disposition of *Erie,* in which the state Supreme Court addresses previously unresolved issues relating to the availability of rescission as a remedy for fraud in the procurement of automobile insurance. *Erie Insurance Exchange v. Lake,* 543 Pa. 363, 671 A.2d 681 (1996).

2. This rule holds true even if the policy was issued based upon fraudulent misrepresentations by the insured. The state Supreme Court, however, remains divided on the issue as to whether rescission is a remedy available for the auto insurer against the insured following the 60-day period and no majority consensus is reached on this issue.

3. Justice Cappy points out that unlike many other types of insurance, automobile coverage is mandatory. As such, the automobile insurance industry holds a virtual monopoly over the pool of consumers. *Id.*

contrast to liability insurance, automobile insurance is effectively preempted at least in-part by a specific statute limiting the otherwise broad right of rescission. Automobile insurance may also be contrasted with liability insurance since the purchase of liability insurance is not mandatory, the consumer is more generally sophisticated, and the bargaining power between insurer and insured is not as highly disparate.

In *Erie,* the State Supreme Court expressly contrasts Act 78 with other bodies of law governing other forms of insurance, thereby giving recognition to the unfettered remedy of rescission in other contexts such as the one presented. *Id. (Erie* was distinguished from *Metropolitan Property, supra,* wherein the State Supreme Court held that the Unfair Insurance Practices Act, 40 P.S. §1171.1 et seq., did not bar an action for rescission of a homeowners policy.)

It follows that the common-law remedy of rescission available in the instant case is neither preempted, abrogated nor limited by means of a statutory body of law resembling Act 78.

Based upon the foregoing, the court hereby grants United National's application for relief and declares the $5,000,000 excess liability insurance policy (no. XTP11511) to be void ab initio.

---

## EXHIBIT #1

## MEMORANDUM AND ORDER

The Supreme Court remanded this case for a determination of whether the doctrine of laches barred plaintiff, United National Insurance Company, from seeking rescission ab initio of two policies of liability

insurance issued to defendant, J.H. France Refractories Company. Policy no. XTP 11511 covered the period June 3, 1982 to June 3, 1983 and policy no. CU8097 covered the period June 3, 1983 to June 3, 1984. By letter dated October 28, 1983, Alexander Brodsky, executive vice president of plaintiff, advised defendant, that both policies were "void ab initio" by reason of "material misrepresentation in securing these policies." The basis was that J.H. France, in response to direct questions about whether it manufactured asbestos-containing products, failed to disclose that it manufactured a cement which contained 26 percent of asbestos fiber, and that claims which alleged injury by reason of exposure to defendant's asbestos-containing products had already been received by the defendant.

In order to prevail, defendant must establish by clear evidence, that it changed its position in reliance upon the inaction of plaintiff in not commencing this action in equity until October 30, 1987. *Gray v. Gray,* 448 Pa. Super. 456, 464, 671 A.2d 1166, 1170 (1996); *Commonwealth ex rel. Robinson v. Robinson,* 505 Pa. 226, 478 A.2d 800 (1984). See also, *Brodt v. Brown,* 404 Pa. 391, 172 A.2d 152 (1961) (in the absence of prejudice, the doctrine of laches will not be applied); *Crunk v. Mid-State Theatres Inc.,* 404 Pa. 22, 27, 170 A.2d 858 (1961) (a 16-year delay in bringing a suit in equity did not bar claim, where no one's position or rights were materially prejudiced by the delay).

At an evidentiary hearing held on April 1, 1996, exhibits P91, G9, G11, and G12 (also designated P110), attached hereto, were put into evidence. John Goertz, who was and still is employed by defendant, testified that during the relevant period, his responsibilities included procuring insurance and processing claims, including asbestos claims. He received P91 from William

France (Senior), then president of defendant, and that he wrote G9 and G11 to Mr. Brodsky at United National. J.H. France never received any response to those letters, nor did the company receive a full refund. The only response came more than two years later by letter from Gerard J. Durkin, then vice-president-claims for United National, dated March 4, 1986. (G12/P110.) Mr. Durkin testified that he did not believe G9 and G11 required any response, since P91 stated plaintiff's position. He wrote G12/P110 because in the period after October 28, 1983, J.H. France, through John Goertz, had sent United National all asbestos-related claims (103 claims) which J.H. France continued to receive, and that Durkin simply wished to reiterate United National's position as stated in the October 28, 1983 letter.

In sum, the evidence established that United National unilaterally declared policy no. XTP11511 "void ab initio" and represented that it would bring a legal action (a declaratory judgment action) to confirm its decision; that the action was never brought; that J.H. France responded to United National's decision by twice asking for the basis for it and by sending to United National all claims against J.H. France falling within the policy period; that United National, contrary to its routine policy, did not respond to the notice of each claim by denying coverage or in any other way, until its letter of March 4, 1986, and did not start this action in equity seeking rescission until October 30, 1987.

There was also testimony by John Goertz that had he received earlier notice that United National really did consider its policy "void ab initio," he "probably could have" obtained other insurance to cover the period that the United policies covered that he "may have been able to, could have been able to" increase the umbrella [policy issued by another carrier]. (N.T. 4/1/96,

26-28.) On cross-examination, Mr. Goertz reiterated his belief that he might have been able to replace the United National policy in October of 1983, but he conceded that he would not have been able to replace a policy which had already expired in June of 1983. [His testimony on this issue was very vague and confused.] (N.T. 4/1/96, 54-59.)

The testimony on April 1, 1996 is to be viewed against the backdrop of evidence and findings of fact in the original trial in 1989, which established that Mr. Goertz knew in May of 1982 that at least 12 actions involving well over 30 plaintiffs had been brought against J.H. France, alleging injury due to exposure to J.H. France's asbestos-containing product and that Allstate Insurance Company, one of J.H France's insurers, had refused to defend the claims. (Finding of fact 2(b), filed January 4, 1990.)

In other words, to the question of whether Goertz could have replaced United National's policy no. XTP11511 in October of 1983, we must add the issue: if the prospective insurer knew of the existence of the asbestos-containing product and the asbestos-related claims already made?

In determining the fact-issues in this case, the trier of fact must use its common sense and its life's experience. It flies in the face of reason to accept the proposition that, if full disclosure to a prospective insurer had been made on or after October 1983, a policy would have been issued which did not contain an exclusion for all asbestos-related claims.

This court found fraud on the part of defendant in the original trial but felt compelled by its (mis)reading of the applicable statute to find against the insurer. Now the court concludes that the defendant, J.H. France, has not established by credible evidence that the delay

in bringing this action in equity until October of 1987 prejudiced defendant. J.H. France has failed to prove laches.

For the reasons set forth in the opinion of the Supreme Court of Pennsylvania dated October 19, 1993 and in this memorandum, this court vacates and sets aside its orders of January 4, 1990 and May 15, 1991 in favor of defendant, J.H. France Refractories Company et al., and orders a new trial.

(This court also suggests that the testimony elicited at the trial in 1989 be incorporated by reference, especially since some of the witnesses who then testified may no longer be available.)

### ORDER

And now, to wit, May 29, 1996, it is hereby ordered and decreed that the above-captioned case shall be listed for retrial forthwith.

---

### EXHIBIT P91

October 28, 1983
J.H. France Refractories Company
The VanBrunt Company, Mineral Industries Inc.
Green Point Fire Brick Company
1944 France Road
Snow Shoe, PA 16874
ATTN: William France, President
Re: Policy no.: XTP-11511: 6/3/82-6/3/83
Policy no.: CU8097: 6/3/83-6/3/84
Gentlemen:

Concurrent with your receipt of this letter you are receiving a notice of cancellation of policy no.: CU

8097 in accordance with the cancellation provisions of that policy. Initial return of premium, based on the cancellation date set forth in the notice, will be made in accordance with the policy provisions.

However, you are advised that our adherence to the cancellation procedures provided for in the policy does not preclude the company from asserting its position at both policy no.: CU 8097 and its predecessor policy XTP-11511, are void ab initio, that is, from the outset, based on material misrepresentations in securing these policies. On the contrary, we intend to initiate a declaratory judgment action to void these policies. Therefore, we specifically tender to you return of full premium paid by you for both policies and if you are in agreement with such an offer, upon notice from you, we shall immediately return the full premium to you.

You should understand that our processing a pro rata return of premium, in accordance with the cancellation provisions of policy CU-8097, is not inconsistent with our tender of return of the entire premium for the policy, it is merely an administrative step of the formal cancellation process. The balance of the premium is specifically tendered to you.

In addition, in the event that policy CU-8097 is not determined to be void ab initio, we want you to specifically understand that it is our position that provisions of the policy entitled "asbestos exclusion" and "occupational disease exclusion" are inherent provisions of that policy, and have been since the inception of the policy. Any representation made to you that this company has agreed to waive those two exclusion provisions, is unauthorized by this company and of no effect.

We hope we shall be able to amicably adjust this situation and we shall be pleased to discuss the matter with you if you desire.

Very truly yours,
/s/ALEXANDER BRODSKY
Executive Vice President

---

## EXHIBIT G9

December 16, 1983
Mr. Alexander Brodsky
Executive Vice President
United National Insurance Company
1737 Chestnut Street
Philadelphia, PA 19103
Re: Your letter, October 28, 1983
Dear Mr. Brodsky:

Your letter to our Mr. France has been referred to my office as the risk management function is handled by me.

I am quite surprised at your comments and position expressed in that letter. Your comments on material misrepresentations leave me stunned. I feel we are and have been direct and accurate in all of our discussions prior to and during our relationship, although, granted, we did deal through other parties whose transactions and translation we are unfamiliar with at this time.

I am specifically asking you why you are taking your position and what information you feel misrepresented or not properly portrayed.

We in no way agree with your offers as set forth in your letter, nor do we agree to your position that

ab initio "asbestos exclusion" and "occupational disease exclusion" are inherent provisions.

We are eager to discuss this situation with you further, if you desire.

Sincerely yours,
J.H. FRANCE REFRACTORIES COMPANY
John C. Goertz
Personnel Manager

CC: W.A. France
Blind CC: William Foster, Esquire
Kelley, Harrington, McLaughlin & Foster
Suite 512, Lewis Tower Building
15th & Locust Streets
Philadelphia, PA 19102

---

EXHIBIT G11

February 10, 1984
Mr. Alexander Brodsky
Executive Vice President
United National Insurance Company
1737 Chestnut Street
Philadelphia, PA 19103
Re: CU8097
Dear Mr. Brodsky:

By copy enclosed, I reiterate my questions of December 16, 1983, relative to your letter of October 28, 1983.

In addition, your letter provided us a notice of cancellation, effective November 30, 1983, or over two months ago.

As the account was paid in full at inception for a period of one year, your cancellation causes a return premium, which, as of this date, is past due.

I impel you answer the questions I have raised to your allegations and to return premiums for the period from cancellation (November 30, 1983) to remainder of policy year (June 3, 1984), as we have obtained coverage elsewhere.

Sincerely yours,
J.H. FRANCE REFRACTORIES COMPANY
John C. Goertz
Personnel Manager

Enclosure

---

EXHIBIT G12 also P-110

UNITED NATIONAL INSURANCE COMPANY
1737 Chestnut Street
Philadelphia, PA 19103
(215) 569-6200
Telex 628-13640

March 4, 1986
J. H. France Refractories Company
The Van Brunt Company, Mineral
Industries Inc. & Green Point
Fire Brick Company
1944 France Road
Snow Shoe, PA 16874
ATTN: William France, President

Re: Policy no: XTP-11511 (6382-63-83)

Policy no: CU 8097 (6383-113083)

Claim no: 8381670

Dear Mr. France:

This follows our October 26, 1983 letter to your companies wherein you were advised, by Alexander Brodsky, former executive vice president of this com-

pany, that it was company's position that both policies XTP 11511 and CU 8097 are void ab initio based on material misrepresentations in securing these policies. Mr. Brodsky has since passed away. Further correspondence should be forwarded to the undersigned.

As Mr. Brodsky advised you in his letter, in the event that policy CU 8097 is not determined to be void ab initio you should understand that it is our position that the provisions of the policy entitled "asbestos exclusion" and "occupational disease exclusion" were provisions of that policy from its inception and there has never been any agreement to waive those two exclusion provisions.

Notwithstanding our stated position, we have continued to receive notice of lawsuits and as of the date of this letter we have received notice of the filing of 103 claims against your companies. All of these lawsuits allege bodily injury as a result of exposure to asbestos products, including those manufactured by your companies. There are many co-defendants in these lawsuits and the stated periods of exposure in the lawsuits, if any, obviously relate to the plaintiff's exposure to any and all asbestos products not necessarily those of your company.

As you are aware, if our two policies, as referred to above, are judicially found to be applicable to any of these claims, our policies provide coverage in excess of underlying insurance as set forth in the schedule of underlying insurance in each of the policies. Without prejudice to our asserted position that our two policies are not in effect, and are not applicable to these claims, we will be in communication with the underlying carriers to follow the ongoing litigation in the event that our policies are judicially determined to be applicable to these matters.

In the event the policies are found to be applicable to these claims, you are advised that it is our position that the policies are only applicable to those cases where it is established that "bodily injury" took place during the effective dates of these policies. The combined period of time would be June 3, 1982 to November 30, 1983.

A number of the claims forwarded to us on the face of pleadings indicate that the plaintiffs left their places of work prior to June 3, 1982 therefore clearly on the face of those claims there would be no coverage under these policies.

You should also be advised that even if the policies are found to be applicable to these claims, there is no coverage under the policy for the punitive or exemplary damages sought in virtually every one of the claims.

We have retained Jonathan Wheeler, Esq. of the law firm of Gallagher, Wheeler, Reilly & Lachat, 1600 PSFS Building, 12 S. 12th Street, Philadelphia, Pa. 19107 to represent this company in a declaratory judgment action to determine our rights and obligations with regard to these policies. We expect you will receive a copy of the complaint for declaratory judgment in the near future.

We would appreciate your forwarding copies of any correspondence in this matter to Mr. Wheeler. Thank you for your attention to this matter.

Very truly yours,
/s/GERARD J. DURKIN
Vice President-Claims

cc: Jonathan Wheeler, Esq.
    Dorex Inc.

## EXHIBIT 2

## FINDINGS OF FACT

(1) J. H. France Refractories Company, The Van Brunt Company, Mineral Industries Inc. and Green Point Fire Brick Co., hereinafter collectively referred to as "France," are a manufacturing corporation and its subsidiaries doing business in Snow Shoe, Pennsylvania. France is a manufacturer of refractory products, specifically fire brick and related items.

(2) (a) In May of 1982, John Goertz, an officer of the defendant and the person responsible for placing insurance coverage, called John LaRosa of Main America Agency and asked LaRosa to obtain $5,000,000 of additional liability insurance coverage.

This insurance was to be in addition to $500,000 of primary liability coverage (issued by Allstate Insurance Company) and $5,000,000 of "umbrella" coverage (issued by Twin City Fire Insurance Company).

Goertz instructed LaRosa to seek such additional coverage from a new carrier and not as an increase of coverage of an existing policy.

(b) At that time Goertz knew:

(i) That France had been sued by one Temple in 1979, who had alleged injury due to France's asbestos-containing product; that Temple had mesothelioma; and that Allstate Insurance Company had refused to defend the action on the ground that asbestos-related conditions were not covered by its policy.

(ii) In 1979, as a result of the lawsuit filed by Temple, that between 1968 and 1972 France had produced a cement which contained 26 percent of asbestos fiber.

Goertz knew at that time that plaintiff's asbestos was alleged to be a hazardous substance which caused severe and even lethal injury to persons exposed to it.

(iii) That France had brought a declaratory judgment action in 1980 or 1981 against Allstate Insurance Company because of its refusal to defend the Temple case.

(iv) That at least 12 actions had been brought against France alleging injury due to exposure to France's asbestos-containing product. One of these actions involved six plaintiffs and another named 24 plaintiffs. Each action demanded compensatory damages in excess of $10,000 and many sought damages in excess of $1,000,000. (P-111, 112, 113, 114, 118, 122, 137, 138, 140, 141, 142, 143, 144, 145, 146, 147.)

(d) LaRosa called William Schock of Tri-State General Insurance Agency and requested that he obtain said $5,000,000 additional coverage on behalf of France.

(e)(i) Schock called Ronald Hihn of Doran Excess Underwriters Inc. Doran Excess Underwriters is a managing general agent for United National Insurance Company, meaning that it had the authority to do the underwriting for and to issue policies of United National. Hihn requested certain information about the proposed insured, France. Among the questions Hihn asked was whether France had any asbestos involvement.

(ii) Schock obtained answers to Hihn's questions from LaRosa as well as an application for insurance filled out by LaRosa. LaRosa got his information from Goertz.

(iii) The application showed two lawsuits involving products of France in 1982 and involving $10,000. (P-8, question no. 17.)

(iv) To the question (no. 9):

"Specify any incidents, indicating exposures such as noxious fumes or waste discharges, defective or recalled products, etc., which occurred prior to the date of this application which could cause injuries to persons or property during the period of coverage requested hereunder."

Goertz advised LaRosa to answer: "None."

(f) As a result of the information supplied to him, Hihn issued a binder on policy no. XTP-11511 issued by United National Insurance Company covering the period June 3, 1982, to June 3, 1983. This was an "excess insurance" policy; that is, United National would not become liable until the underlying coverages of Allstate and Twin City was exhausted. (P-44, P-37, P-121.)

(g) Thereafter, on July 12, 1982, Hihn asked Schock for a description of the two lawsuits mentioned on the application (P-8, question no. 17) and was advised by John LaRosa that:

"(1) A claim was made against Bethlehem Steel by an employee for workers' comp. and liability coverage for some sort of a lung condition.

"The employee ended up suing Bethlehem Steel and all the suppliers of any product to the steel.

"There were about 20 defendants. The insured in this case didn't feel he was doing business with Bethlehem Steel when the loss was thought to have originated.

"(2) The second loss was very similar to the first loss. Again, J.H. France was enjoined with 20 other defendants. No verdict or evidence that they are involved has been proven to date." (P-40.)

(h) Policy of insurance no. XTP-11511 was issued on August 4, 1982 for $5,000,000 covering the period June 3, 1982 to June 3, 1983. (P-43.)

(3) On June 3, 1983, in response to a request for renewal information, on a so-called "short form," Hihn learned from Schock, who had been informed by LaRosa, that:

(i) France had three products liability cases involving $10,000 (as opposed to two reported on exhibit P-8) and

(ii) that from 1968 to 1972 France had produced a cement containing 26 percent asbestos fiber; the product was discontinued in 1973. (P-7, P-57, P-62, P-64.)

(4) As a result of the above information, Hihn, of Doran Excess Underwriters, ultimately forwarded a policy of insurance, no. CU-8097, issued by United National Insurance Company, titled an umbrella policy and providing for $15,000,000 of insurance for the period June 3, 1983 to June 3, 1984, but with an asbestos and occupational disease exclusion attached. Defendant, France, refused to accept this policy. (P-74.)

(5) On September 12, 1983, plaintiff, United National, received notice of a claim and brought by one Nickell in the United States District Court for the District of Maryland based upon exposure to France's asbestos-containing product. Said suit papers were forwarded to United National by Doran. (P-121, P-122.)

(6) On October 28, 1983, Alexander Brodsky, then president of United National, wrote to the president of J.H. France Refractories Company et al., advising defendants that United National considered policy no.

XTP-11511 as "void ab initio," based "on material mis-representations in securing these policies."

(7) Suit was started in this court on October 30, 1987, in which plaintiff sought to rescind policy no. XTP-11511 as of June 3, 1982, its starting date.

## DISCUSSION

### Rescission

In order to avoid its obligations under an insurance policy, the insurer has the burden of proving that the statements made by an applicant on the application were false and material, and that the applicant knew that the statements were false and made them in bad faith. In addition, the insurer must establish that it relied upon the misstatements in issuing the policy. *Evans v. Penn Mutual Life Insurance Co.*, 322 Pa. 547, 560, 186 A. 133, 141-42 (1936); *Piccinini v. Teachers Protective Mutual Life Insurance Co.*, 316 Pa. Super. 519, 463 A.2d 1017 (1983).

This court has found that plaintiff United National has sustained its burden and has proven that France, through its agents, made false statements when it misrepresented the state of its potential liability from claims already made against it by persons claiming asbestos-related injuries caused by France's products.

From the evidence presented, it appears that France's agent/employee, John Goertz, knew these statements to be false and, through silence and a self-serving interpretation of questions on the insurance application, intentionally kept the asbestos information from United National so France could obtain insurance coverage.

The evidence clearly establishes that had United National known that France had produced a cement which contained 26 percent of asbestos fiber, and that France

had been the defendant in a number of asbestos-related lawsuits, it would not have issued the policy to France.

Therefore, this court finds that the plaintiffs have met all the elements required to rescind an insurance policy on the grounds of false and fraudulent representations.

## Statute of Limitations Defense

Defendant France contends that plaintiff's claim is barred by the statute of limitations or, in the alternative, the claim is barred by the doctrine of laches.

Statutes of limitation are statutes of repose, and represent pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within specified period of time and that the right to be free from stale claims in time comes to prevail over the right to prosecute them. *U.S. v. Kubrick,* 100 S.Ct. 352, 444 U.S. 111, 62 L.Ed.2d 259 (1979). Statutes of limitation afford plaintiffs what the legislature deems reasonable time to present claims. They also protect defendants and courts from having to deal with cases in which the search for truth may be seriously impaired by loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise. *U.S. v. Kubrick, supra.*

The defense of statute of limitations is not a technical defense but substantial and meritorious; such statutes are vital to the welfare of society and are favored in the law. *Schmucker v. Naugle,* 426 Pa. 203, 231 A.2d 121 (1967).

Under Pennsylvania law, a cause of action for fraud or deceit does not trigger the running of a statute of limitation until such time as the fraud has been or should have been discovered by the exercise of due diligence.

*Rothman v. Fillette,* 503 Pa. 259, 469 A.2d 543 (1983). This is consistent with the general rule that a cause of action does not accrue until the time when the plaintiff could have first maintained the cause of action to a successful conclusion. *Kapil v. Association of Pennsylvania State College and University Faculties,* 504 Pa. 92, 470 A.2d 482 (1983).

Plaintiff claims that its cause of action accrued in July 1982, when Hihn of Doran, United National's agent, received a memo from John LaRosa (P-40) describing the two lawsuits mentioned on the insurance application (P-8, question no. 17) as claims for workmen's comp. and liability coverage against Bethlehem Steel for "some sort of a lung condition." Plaintiff asserts that at this time, Hihn was put on notice and could have discovered the fraud by the exercise of due diligence.

This court finds that the memo received by Hihn on July 21, 1982 was not sufficient to compel plaintiff to inquire further. The memo stated that the insured, France, "didn't feel he was doing business with Bethlehem Steel when the loss was thought to have originated." (P-40.) The response did not mention asbestos and stated, in effect, that France was improperly sued. There was no reason for Hihn or United National to question this response or to suspect that France had any involvement with asbestos. The reference to "some sort of lung condition" could result from things associated with steel rather than asbestos-containing products.

Hihn was the underwriting and issuing agent for United National in this case. He was most alert to the risks involved in asbestos-containing products and he testified that it was on his own initiative that he instituted the policy of not insuring against any asbestos-related risks. (Testimony, November 10, 1989.) Yet Hihn did not take any action nor register any concerns when

he received LaRosa's memo. (P-40.) Plaintiff should not be permitted to claim that its agent, Hihn, was put on notice of an asbestos-related risk when in fact he was not.

This court believes the earliest that plaintiff should have discovered defendant's fraud was from the June 3, 1983 renewal "short form" (P-62), where agents of France, LaRosa and Schock, informed Hihn, the agent of United National, that France had three products liability cases rather than the two reported on the insurance application (P-8) and for the first time admitted that from 1968 to 1972, France had produced a cement containing 26 percent asbestos fiber. When this information was discovered, the renewal policy issued by United National contained an asbestos and occupational disease exclusion. It was at this time that plaintiff knew or had reason to know of defendant's prior misrepresentations regarding its asbestos involvement and liabilities.

Common-law fraud cases accruing after February 18, 1983 are governed by the two-year statute of limitation for fraud. 42 Pa.C.S. §5524 reads in pertinent part:

"The following actions and proceedings must be commenced within two years: . . .

"(7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter."

Common-law fraud actions accruing between June 27, 1978 and February 18, 1983 are governed by the six-year statute of limitations, 42 Pa.C.S. §5527(6), the so-called "catchall provision." The "catchall provision"

of section 5527(6) applies where an action is "neither subject to another limitation specified in this subchapter nor excluded from the application of a period of limitation by section 5531." 42 Pa.C.S. §5527(6).

Common-law fraud actions were not excluded from the application of a period of limitation by section 5531, nor were they subject to any other limitation until the 1982 amendment of 42 Pa.C.S. §5527, which was effective February 18, 1983 and which expressly applied a two-year limitation to fraud claims. 42 Pa.C.S. §5527(6); *A. J. Cunningham Packing Corp. v. Congress Financial Corp.,* 792 F.2d 330 (3d Cir. 1983); *Gabriel v. O'Hara,* 368 Pa. Super. 383, 534 A.2d 488 (1987).

Plaintiff United National argues that this court should apply the six-year statute of limitation, asserting that its case accrued July 1982, during the June 23, 1978-February 18, 1983 "window." Had plaintiff's cause of action for fraud accrued in July 1982, the six-year statute of limitation would apply and the October 30, 1987 filing of plaintiff's complaint would have been timely.

However, because this court has found that the cause of action accrued on June 3, 1983, when Hihn received the renewal application from LaRosa, the two-year statute of limitations applies, requiring plaintiff to have commenced suit no later than June 3, 1985.

This court is now compelled to hold that plaintiff United National's suit is barred by 42 Pa.C.S. §5524(7) because this cause of action was filed approximately two years after the applicable statute of limitations ran. This is a most unfortunate result given the fact that this court has found that defendant France obtained $5,000,000 worth of insurance coverage benefits from its fraud. Nevertheless, it has been said that the law is a two-edged sword. Plaintiff had rights, but also a duty to enforce them without unreasonable delay.

When a statute fixes a time within which to commence legal proceedings, courts have no power to extend the time or to allow the act to be done at a later day, as a matter of indulgence. *Stewart v. Masson,* 27 Beaver 85, 40 D.&C.2d 401 (1966).

Therefore, policy no. XTP 11511 is in effect according to its terms and covering the period June 3, 1982 to June 3, 1983.

## CONCLUSIONS OF LAW

(1) John Goertz, John LaRosa and William Schock were all agents of defendant, J.H. France Refractories Company et al., for the purpose of obtaining excess liability insurance in favor of France in the amount of $5,000,000 covering the period June 3, 1982 to June 3, 1983.

(2) Ronald Hihn and Doran Excess Underwriters Inc. were the authorized agents of United National Insurance Company for the purpose of underwriting policies of insurance and issuing same.

(3) Defendant France, acting by and through its agents or employees, misrepresented material facts to agents of United National Insurance Company, intending thereby to induce United National to rely upon them, and, in reliance thereon, United National issued liability insurance policy no. XTP 11511.

(4) Plaintiff United National Insurance Company, knew or had reason to know on June 3, 1983 that a cause of action existed against defendant France. Plaintiff United National is not charged with such knowledge prior to that date (*i.e.,* exhibit P-24 was not sufficient to put plaintiff on notice).

436

(5) The applicable statutes of limitations require that plaintiff commences suit no later than June 3, 1985. 42 Pa.C.S. §5524(7).

(6) Plaintiff's action is barred by the applicable statute of limitations.

ORDER

And now, January 4, 1990, verdict is hereby entered in favor of defendants and against plaintiff, United National Insurance Company.

BY THE COURT:
/s/Caesar, J.